14064

TURNER *ET AL.* v. AMERICAN MOTORISTS INS. CO.

(180 S. E., 55)

*Messrs. Haynsworth & Haynsworth,* for appellant,

*Messrs. J. G. Leatherwood* and *W. E. Bowen,* for respondents,

May 15, 1934.

The opinion of the Court was delivered by MR. JUSTICE BONHAM.

The appellant corporation issues to its members accident insurance policies which provide for the payment of $1,-000.00 to the estate of the policyholder upon his death, if it result from external, violent, and accidental means, only if such injuries are sustained "while driving or riding in an automobile." The complaint alleges that while T. M. Turner was riding in an automobile he met his death by accidental means by being thrown therefrom.

The answer denied this allegation of the complaint and alleged that the policy of insurance specifically provided that, "A. This policy shall not cover: (11) For any accident sustained while entering or leaving an automobile," and that the injuries to decedent occurred while he was stepping from and leaving an automobile.

It is conceded in argument that the sole question to be decided is, in general terms: Did T. M. Turner suffer the injuries which caused his death while riding in an automobile, or when he stepped from it?

The case was tried by Judge Grimball and a jury at Greenville. At the conclusion of the taking of the testimony, the defendant moved that a verdict be directed in its favor on the ground that the only reasonable inference to be deduced from the evidence was that Turner was injured as he stepped from the automobile, which class of injury was directly excluded from the provisions of the policy.

His Honor denied the motion (see pages 49 and 50 of the transcript), saying:

"The Court: The difficulty with this case is this, the two propositions, one is the fact that in our state we have what is called the scintilla rule, if there is a scintilla of evidence to go to the jury our Supreme Court is going to say, as it has said in numbers of other cases, that the case ought to go to the jury; and I am inclined to think that in this case that is just what there is, a scintilla; then the second difficulty in the case on this motion is the plain tendency of our Supreme Court in insurance cases to hold the insurance companies to liability. I have decided quite a few cases on these motions and I think almost invariably the Supreme Court has reversed the cases that I decided.

"I remember that I had one in Anderson where the policy of insurance provided for sick benefits in case of a disease necessarily confining one to his bed. The disease in question did not necessarily confine him to his bed. I granted the motion for directed verdict and the Supreme Court said that 'necessarily confining to bed' meant 'substantially confining to bed,' reversed the case and sent it back. Then I had another insurance case over there in Anderson, Fowler; I tried to follow the Supreme Court to the best of my knowledge and they reversed that. And one or two others. Now, I am trying to figure what the Supreme Court would do with this case; I am inclined to think that they would say that I ought to have left the case to the jury on this testimony, if there is a scintilla, and, therefore, I am going to refuse the motion and leave the case to the jury."

The jury found for the plaintiff. This appeal followed.

The appellant labors under the erroneous idea that the Supreme Court has overruled the pronounced principle, to wit, if there is any relevant testimony, amounting to a scintilla, it must be left to the jury to determine its force and effect. The meaning of the rule is that there must be some *evidence* arising out of the testimony

which elucidates the issues of fact, and which enables the jury to form an intelligent conclusion. It does not authorize the admission of speculative, theoretical, and hypothetical views. It does not set aside the rule of force in this State relating to *res ipsa loquitur,* which doctrine does not prevail in this State.

In the case of *Taylor v. Railway Co.,* 78 S. C., 552, 556, 59 S. E., 641, 643, this Court said: "A scintilla of evidence is *any material* evidence that, if true, would tend to establish the issue in the mind of a reasonable juror." (Italics added.)

Whilst adhering to the scintilla rule, this Court has recognized a rule supplemental to the scintilla rule, which is thus propounded in the case of *National Bank v. Thomas J. Barrett, Jr., & Co.,* 173 S. C., 1, 174 S. E., 581, 582: "If it be conceded that there may be deduced by a process of unusual finesse of reasoning that there is a scintilla of evidence * * * nevertheless there is another rule, more founded upon common sense and reason, to the effect that when only one reasonable inference, not just one inference, but one reasonable inference, can be deduced from the evidence, it becomes a question of law for the Court, and not a question of fact for the jury."

In the case of *City of Chester v. National Surety Co.,* 91 S. C., 17, 74 S. E., 37, 39, that sound jurist, Mr. Justice Hydrick, delivering the opinion of this Court, said: "There was no issue as to any matter of fact—*at least as to any fact about which more than one reasonable inference could be drawn. Therefore, the court properly directed the verdict."* (Italics added.)

In the case of *Bushardt v. United Investment Co.,* 121 S. C., 324, 113 S. E., 637, 639, 35 A. L. R., 637, Mr. Justice Marion, likewise a sound and learned jurist, said: "Under the well-settled rule if only one reasonable or legitimate inference can be drawn from the evidence, the question is one of law for the court." Citing *Ford v. Kelsey,* 4 Rich., 365.

This declaration is but to say that the scintilla of ■ evidence upon which a case should be sent to the jury must be real, material, and pertinent and relevant evidence, not speculative and theoretical deductions.

In order to determine the cardinal issue in this case, we must analyze the evidence contained in the record. To properly understand it, a brief history of the occurrence leading up to the tragic moment is necessary.

Medlin was driving a bus usually used for taking children to school. On the day in question, when he reached the house of the deceased, T. M. Turner, the only persons in the automobile were Mrs. Redding and her six-year-old son. Mr. Turner was standing beside the road, stopped the car, and asked who killed his dog, to which Medlin said the man in the car just ahead of him. Turner had a claw hammer in his hand; he asked Medlin to catch the fellow in the truck who had run over the dog, and boarded Medlin's automobile. Medlin pursued the truck. Just as he passed it, Turner either fell from or stepped from the car and suffered the injuries from which he died.

For the plaintiff, Dr. Wilson described the wounds and injuries suffered by Turner; Homer Medlin, W. D. Fortner, and Byrd Hunt testified as to the condition of the car, the manner in which the door was opened. T. C. Turner testified to the fact of the appointment of himself and W. H. Turner as administrators in lieu of their mother. W. H. Turner testified in reply to and in contradiction of Mrs. Redding.

The plaintiffs had no eyewitnesses to the movements of Turner at the fatal moment. Their theory is that the door of the automobile was tricky, could be opened by the sudden violent action of the car, and by one taking hold of the lever; that just as Medlin's car passed the truck he was following, Turner got up and took hold of the lever which opened the door, that just then the car swerved, stopped suddenly, and precipitated him out of the car.

The door was on the right-hand side of the driver. Medlin testified, in chief, that when Turner got on the bus he sat right next to the door; was traveling at a rate of 30 or 35 miles an hour when he passed the truck; just as the front of his bus passed the truck, Mr. Turner reached up and pulled the door open. "I told him not to pull the door open till I stopped"; after that "the only thing I saw the door flew open and he was done gone out"; stopped in about three lengths of my car; was traveling about 30 or 35 miles "when he took hold of the lever that pulled the door open"; slackened his speed "just a little bit" when Turner took hold of the lever; was fixing to stop. The door opened by a big lever in a round circle, you had to take the lever like that and pull it open; the tie rod was about three feet from the lever; from the lever to the door was about three feet; the door opened pretty easy; did not see Mr. Turner any more as he pulled the lever and the door flew open.

On cross examination, he said: When you pull the lever, the door will open; if you do not pull the lever and pushed against the door you could not push it open; if a grown man fell up against it, it would not fly open. You can not make it open till you take the lever and pull it around; this door did not come open accidentally, Mr. Turner meant to open it. Turner had the claw hammer in his hand just as he got up and opened the door; "just as he went to pull the lever and I told him not to pull it, and that is the last I saw of him"; did not know Turner was going to step off till witness stopped; took his eyes off of him then; do not know how he stepped off, whether with his right or left foot; there is no question that Mr. Turner deliberately opened the door, it did not come open accidentally.

This witness, Medlin, was recalled for further cross examination. He was asked:

"After Mr. Turner stood up and opened that door, did you do anything in the way of a sudden jerk of (or?) sudden slapping on of the brakes too quickly; did you do any-

thing of that sort that could have thrown him out that door?"

He answered: " I did not."

On redirect examination, he said: "I was slowing up at the time. I had not put on the brakes as he opened the door. I put them on in a second or two. I had released my gas, I was slowing up when he got up there."

On recross examination, he said he slacked up gradually, there was no sudden jamming on of the brakes, and stopping; these big trucks will not stop sharply.

Mr. Fortner and Mr. Hunt testified to the good condition of the bus, its construction, the situation of the door, how it opened, etc., in substantially the same way as did Mr. Medlin.

Byrd Hunt testified that if "a man happens to be standing up in this bus holding to this lever and the car running and it probably turn around a little, it is liable to fly open and throw him out." An ordinary man reaching up and taking hold of the lever, standing up and holding the lever, would be right in front of the door.

The testimony of W. H. Turner, in reply, will be considered after examining the testimony for the defendant.

The only witness for the defendant was Mrs. Redding, who was alone with her small son in the automobile when Mr. Turner got on it.

She testified that Turner stopped the bus, asked the driver who killed his dog, asked if he could overtake the man in the truck, got on the bus, said you pass him then I will jump out, told the driver not to stop; and the driver said, "Don't you jump out, I will stop"; after they passed the truck the bus driver began to slow down and Mr. Turner got up and opened the door and stopped for just a second, and when he stepped out he fell and I looked out, it was just far enough I could see him fall, and the driver stopped the car so suddenly it liked to thrown me out of the seat, and it scared me. That was after the man got out, he stopped so quick he just

jerked the car and he jumped out and ran back to him. I was the width of the bus from him when he got up to open the door, could see him clearly, saw him open the door with his hand, he stood there just a minute and then stepped out, I could not see the minute his feet hit the ground for I was on the opposite side of the bus, but the minute I could see, that we got back far enough, he was laying in the road; the bus was going pretty fast; when Mr. Turner stepped off, the driver of the bus had sorter gotten around the truck and pulled back to the right-hand side of the road; Mr. Turner fell and lay on the right of the pavement, his head was on the pavement; the driver had warned him, said, "don't step off, wait until I stop"; told him that after he opened the door.

On cross examination, she testified: Did not see the man run over the dog; heard Mr. Turner talking to the driver; I thought he was after the driver of the truck for the dog. I got a little excited when he got on the car, I thought there was going to be a fight when they caught the truck. Mr. Turner was on the right-hand side and I was right behind the driver; he was sitting on the end of the bus right by the door, looking ahead; it seemed like the car was running pretty fast; he told him to pass him and he would get out. He told him when he got on the bus, said, "You drive around to the front and I will get out"; he meant to go around and head off the man and he would get out; Mr. Medlin told him not to get out till he stopped when Mr. Turner said he would get out; he told him that when he first got in; Mr. Turner did not say anything to that, he did not say I will get out anyhow. I never heard any other conversation between them then; then, when they got even with the truck, Mr. Turner told Mr. Medlin just to surround him and he would get out, he had told him that when he got on, he told him that again and Medlin told him he would stop; told him "Don't try to get off I will stop"; and he got up and opened the door; he just stopped for a second and just

stepped out. She was asked: *"Could you see whether he stepped or was thrown out?"* She answered: *"His foot went down in the door, they didn't both go down at once."* (Italics added.) It was pretty high there, a pretty good jump off; there is one step and about three feet to the ground. She was asked: "And all you saw he got up and the door came open?" She answered: "He opened the door." Again, she was asked: "All you know is that while Mr. Medlin was in the act of stopping that truck he got hold of that lever and the door flew open and you think he stepped out?" She answered: "He opened the door." "Q. That is it, I see, he opened the door, the door came open, and the next thing you saw was that he was going out the door? A. He stepped out the door, yes sir, the last I seen of him. I saw him stepping out the door, don't know whether he stepped on the step or not, couldn't see the step, don't know whether his foot hit it."

With the view of laying the foundation to contradict this witness, she was asked by plaintiff's counsel:

"Q. I am going to ask you if on that occasion you didn't tell Mr. Turner here in the presence of Mr. Landers at your home a few days after Mr. Turner's death that as far as you knew it, as far as you saw it, he fell out of the truck, or words to that effect? A. No, sir.

"Q. You didn't make any statement like that? A. No, sir."

On redirect examination she was asked: "Q. When they came out there what did they ask you to do? A. He asked me if I would swear for them that he fell off the bus, I told him I couldn't do it; he said I would get good pay for it. They did not subpœna me to Court, didn't ask me to come."

On recross examination she was asked:

"Q. Mr. Turner just came to ask you about how his father got killed, he didn't try to persuade you to tell a falsehood? A. He didn't try to persuade me at all; Mr. Landers told me that if I would swear for Mr. Turner that

he fell off the bus they would pay me well. and I told him, then, I couldn't do it, that I couldn't swear a story, and I didn't think he fell off accidentally, and I have not seen Mr. Landers since, and I would not never know Mr. Turner any more, I never saw him before.

"Q. When did you tell that you saw about this and that he jumped off? A. I didn't tell anybody that he jumped off."

In reply, W. H. Turner, one of the plaintiffs, testified he was asked: "I asked Mrs. Redding on the stand awhile ago if at her house shortly after your father's death in the presence of Mayes Landers if she didn't tell you, Wade H. Turner, that Mr. Turner, as far as she saw it, fell out of the bus. A. That is what she said.

"Q. Mr. Turner, she also stated that Mr. Landers, I believe it was, said they would pay her big money if she would testify? A. I didn't hear that. I told her if she would come up in Court she would get pay for her time.

"Q. At the time you were investigating did you have any idea bringing any suit in any Court at that time? A. I sure did not."

On cross examination he said he did not bring Mrs. Redding to testify because he thought the State would do it, that he just went out there to investigate "to find out how he had fell off"; was not trying to collect under the policy, thought they would pay off.

"Q. Well, you wanted to collect money out of the policy, that is what you were investigating about? A. I want what is coming to me."

A full synopsis of the evidence is given in order that the Court may determine if there is even a scintilla of evidence which measures up to the standard of scintilla evidence fixed by this Court in *Taylor v. Railway Co., supra,* to wit: "A scintilla of evidence is any *material* evidence that, if true, would tend to establish the issue in the mind of a reasonable juror." (Italics added.)

Respondents' case must stand or fall upon proof that the decedent came to his death by being thrown, or by falling, from the automobile. It is so "nominated in the bond." The theory upon which they proceed is that the door of the bus upon which he was riding was "tricky," could be jarred open by sudden action of the bus, or that Turner opened the door and the sudden and violent swerving of the bus threw him out. Their whole testimony is devoted to trying to prove this hypothesis. Fortner and Byrd contribute nothing to show what happened at the time of the occurrence; their testimony goes to describe the bus, its arrangements, condition, especially that of the door. If all they have testified to be accepted as true, it throws no light on the cardinal question whether Turner was thrown, or fell, or stepped from the automobile. Their witness Medlin, the driver of the car, practically destroys the theory that because the door was easy to open and tricky it flew open on this occasion and Turner was thrown out. At folio 42 of the record Mr. Medlin said: "Just as I went in front of the truck, front of my truck passed the other, Mr. Turner reached up and pulled the door open. I told him not to pull the door open until I stopped."

On cross examination, he said: "If you don't pull the lever, if you went there and pushed against the door you couldn't push it open, not even if a grown man fell against it; that door is so constructed it won't open of its own accord, you can't make it open until you take the handle and pull it around in a semi-circle; that door didn't come open accidentally; Mr. Turner meant to open it." He was asked:

"Q. Well, there is not any question, is there, then, that Mr. Turner put his hand on that thing and deliberately opened it, is there? A. Yes, sir, he opened it.

"Q. The door didn't come open accidentally, did it? A. No, sir."

That disposes of the theory that the door flew open and Mr. Turner was thrown through it.

The plaintiff's theory proceeds upon the assumption that if Mr. Turner opened the door, he was in front of it and by some sudden movement of the bus was thrown through it. Where is the proof in support of this assumption?

It is shown, as hereinabove quoted, folio 42, that Mr. Medlin testified that just as he passed the truck he was pursuing, Mr. Turner reached up and opened the door; he told him not to open it until he stopped, he added after that, "The only thing I saw the door flew open and he was done gone out. I had just cut off the gas as he took hold of the lever, was making around thirty or thirty-five when I passed the truck." When he took hold and the door flew open, "I was checking then."

Upon this evidence it is argued there was a reasonable inference that in the stopping of the bus Mr. Turner was thrown out; that there is the scintilla of evidence which justified sending the case to the jury. This same witness for plaintiff was asked on cross examination:

"Q. Mr. Medlin, * * * After Mr. Turner stood up and opened that door did you do anything in the way of a sudden jerk, of sudden slapping on of the brakes too quickly; did you do anything of that sort that could have thrown him out the door? A. I did not."

He said further the bus was running smoothly on a smooth pavement. On redirect examination he said he was slowing up, he had not put on the brakes as he (Turner) opened the door, put them on in a second or two; had released the gas; was slowing up when he got there.

On recross examination he said, "slackened up gradually, there was no sudden jamming on of the brakes and stopping; one of these big trucks will not stop sharply."

You will search the plaintiff's evidence in chief in vain for that scintilla of material evidence that warranted sending the case to the jury. But it is contended that they drew from Mrs. Redding, the witness for the defendant, state-

ments which, by contradiction, entitled them to go to the jury. We will discuss that directly.

As against theoretical, hypothetical evidence for the plaintiff is the positive evidence of Mrs. Redding, the only eyewitness of the occurrence, save Mr. Medlin, that Mr. Turner received his fatal injuries as he was getting out of the car. If this be true, plaintiffs are barred from recovery by the express terms of the policy.

Mrs. Redding testified at folio 124 *et seq.*, speaking of Mr. Turner, she said: " * * * He said well, you pass him and says then I will jump out and you not to stop, and the driver said don't you jump out, he said I will stop. * * * And after that passed the driver began to slow down and Mr. Turner got up and opened the door and stopped for just a second and then just stepped out and when he stepped he fell and I looked out, it was just far enough I could see him fall and the driver stopped the car so suddenly it liked to thrown me out of the seat, and it scared me." She said further: "I could see him clearly, I could see him open the door with his hand, he stood there for just a minute and then stepped off."

From this plain statement, a rigid examination by able and astute counsel could not swerve her. In answer to the question: "When he opened the door what took place?" she said: "He just stopped for a second and just stepped out."

"Q. Could you see whether he stepped or was thrown out?" To this she made this convincing answer: *"His foot went down in the door, they didn't both go down at once."* (Italics added.)

But it is urged that Mrs. Redding is contradicted on this matter. Let us see. On cross examination she was asked: "Didn't you tell Mr. Turner in the presence of Mr. Landers at your home a few days after Mr. Turner's death that as far as you knew it, as far as you saw it, he fell out of the truck? A. No, sir.

"Q. Or words to that effect? A. No, sir.

"Q. You didn't make any statement like that? A. No, sir."

On redirect examination she was asked: "When they came out there to see you what did they ask you to do?

"A. He asked me if I would swear for them that he fell off the bus, I told him I couldn't do it.

"Q. What did they say about paying you if you would swear right? A. He said I would get good pay for it and I told him I was trying to make an honest living."

Mr. Wade H. Turner is put up to contradict her. The question asked her by plaintiffs' counsel if she had made the statement to him in the presence of Mr. Landers that his father had fallen off the bus was repeated to Mr. Turner and he said: "That is what she said." Mr. Turner was also asked: "She also stated that Mr. Landers, I believe it was, said they would pay her big money if she would testify.

"A. I didn't hear that.

"Q. Did you offer her anything? A. *I told her if she would come up in Court she would get pay for it.* (Italics added.)

"Q. At the time you were investigating, did you have any idea of bringing any suit in any Court at that time? A. *I sure did not."* (Italics added.)

On cross examination he said they did not have Mrs. Redding as a witness for the plaintiffs because he thought maybe the State would do that. When asked if he was investigating because he wanted to collect the policy, he answered: "I want what's coming to me," but that was not the reason for the investigation when he went to see Mrs. Redding. Note the contradictory and evasive testimony of this witness.

He said in answer to a question of his counsel that when he was talking to Mrs. Redding he had no idea of bringing any suit on the policy; *and yet* just the instant before he had testified that he *"told her if she would come up in Court she would get pay for her time."* (Italics added.) The two statements are utterly incompatible and contradictory.

There could be no occasion for him to tell her she would be paid for her time if she would come up in Court, if he contemplated no Court proceeding, and was not then discussing with her what her testimony would be.

This witness had been asked if Mr. Landers had told Mrs. Redding "they would pay her big money if she would testify." His answer was: "I didn't hear that." He does not say it did not occur, only, that he did not hear it. Mr. Landers did not testify. It was testified that he had "T. B." and was taken to the hospital the week before the trial. They could have taken his testimony by deposition.

Most significant is the fact that the plaintiffs did not have Mrs. Redding in Court to testify in their behalf, if it be true, as Wade H. Turner testifies, she had told him that his father fell out of the bus. That was the controlling issue in the case, and she was the only person who could say definitely whether he fell, was thrown, or stepped out of the bus.

It was obligatory on the plaintiffs to prove their case by the preponderance of the evidence; this evidence in reply is purely negative. The only reasonable deduction from this testimony is in support of Mrs. Redding's testimony.

If it be held to present a scintilla of material evidence sufficient to take the case to the jury as affirmance of plaintiffs' case, then in every such case an ingenious litigant can present such an issue by approaching an opposing litigant or his witness, and thereafter asserting such opponent or witness has made a statement which he knows such person will deny. on the trial, and then go on the stand and testify that such statement was made. This would be a most dangerous precedent to establish.

The motion for directed verdict for defendant should have been granted.

Judgment reversed and complaint dismissed.

Mr. Chief Justice Stabler, Mr. Justice Carter and Messrs. Acting Associate Justices T. S. Sease and A. L. Gaston concur.