15386

YOUNG *ET AL.* v. HYMAN MOTORS, INC., *ET AL.*

(19 S. E. (2d), 109)

June, 1941.

The order of Judge Lide, ordered to be reported, follows:

This appeal does not involve any question as to the amount of compensation or the liability of defendants on account of the same, but the sole question involved is whether or not the same should be paid to the respondent as the widow of the deceased, or the appellants, his next-of-kin. The full commission by its opinion and award dated April 5, 1941, affirmed Commissioner Hyatt, the hearing commissioner, in his award of such compensation to Mrs. Young.

There are three grounds of appeal, but they make the single point that, as appellants contend, the only reasonable inference to be drawn from the evidence is that Mrs. Young was living apart from her husband for no justifiable cause, and that she had voluntarily elected to live separate and apart from him, and was therefore not his widow within the terms of the Workmen's Compensation Act.

It is provided in Section 39 of the Act, 39 St. at Large, p. 1251, that a widow shall be conclusively presumed to be wholly dependent for support upon the deceased employee, but in Section 2 of the Act, Subdivision (n), the term "widow" is defined as follows: "The term 'widow' includes only the decedent's wife living with or dependent for support upon him at the time of his death; or living apart for justifiable cause or by reason of his desertion at such time."

The only evidence on the phase of the case with which we are concerned is the testimony of Mrs. Young herself, certain letters admittedly written by her to Mr. Young, and a separation agreement in writing. Before her marriage Mrs. Young was Miss Jane Watson, of Bamberg. She took training as a nurse at McLeod's Infirmary, at Florence, and after her graduation as such she did private duty nursing in Florence. She became acquainted with Mr. S. K. Young about a year prior to their marriage, and after the marriage they lived in an apartment in the City of Florence. She continued her name on the registry of nurses as open to employment but, because of her status as a married woman, she testifies that she received very few calls, and most of her time was

devoted to housekeeping and cooking in her home. She says further that she and Mr. Young were very happy after their marriage and that they got along all right "except for a few financial worries" arising out of the fact that he had bought certain furniture and household equipment on the installment plan, and that he made $18.00 a week only on the job he held with Hyman Motors, Incorporated, and furthermore that he was fond of expensive food. But she charges no ill treatment on his part and no misconduct whatever. And according to her testimony her only complaint is that "we did have a tough time financially."

However, about three months after they were married she returned to her parental home in Bamberg without the knowledge or consent of her husband and so far as the record shows, without any forewarning to him whatever, leaving on his bed a letter of which the following is a copy:
"Dearest Ekkie:

"I know this is a shock to you, but I find that I cannot say what I want you to know. So I will write it! You probably won't understand, but I wish you could.

"Ekkie, I find it very hard to say what is in my heart, because we have been so close and shared a good bit together, and I have every right to be very happy with you, because you have given me all the worldly possessions within your power, but those things are not all that makes happiness—for one of my type. Ekkie, we have both tried so hard, perhaps you've tried harder than me, to live peaceably with each other, but we've got to face the fact that we're so different in our ideals and ways of living as Venus and Mars are! Every day I've felt worse over this fact, but it faces me fully in the face now, and I can't stand the strain of trying to adjust to your way of living any longer. So many girls would be happy and make you a home, but we're just not alike, my dear, and we shouldn't have ever been bound by matrimony. Please, Ekkie, please don't try to take any action of any kind, or call me, or find me, unless you hear further from me, for I want to be quite alone for a few weeks before I say any-

thing further. I don't feel that either of us will regret my taking this step, because we both know within our hearts that our marriage was a mistake. If there's anything you wish to say, wait a few weeks before telling me, won't you?

"If I've left my belongings, I'll get them sooner or later—I must go now—or must I?

"Jane"

This well-expressed letter plainly indicates that Mrs. Young was voluntarily electing to live separate and apart from her husband, and as a matter of fact, she never did return to his home. As she says in her letter: "I don't feel that either of us will regret my taking this step because we both know within our hearts that our marriage was a mistake." It will be observed that there is nothing whatever said or intimated in this letter about any financial difficulty. Nor is there any suggestion that Mrs. Young merely wanted to go out and do some work herself so as to assist her husband financially.

But she testifies that when he came to Bamberg to see her two days later, he agreed with her that it would be best for her to go to Rock Hill "and work a little while until we had paid off some of our debts." I also quote in this connection the following from her testimony:

"Q. When Mr. Young came to Bamberg, what was his attitude toward you at that time? A. He, of course, could not exactly understand why I would want to go ahead and work, he did not agree to it absolutely, but we talked it over three or four hours, and we did finally agree that the best thing for me would be to go to Rock Hill and try it out and see how it would turn out."

Mrs. Young did go to Rock Hill where she accepted a position in a hospital which employed graduate nurses. And thereafter she never did call on Mr. Young for any assistance in her support. It appears that she went to Rock Hill on or about May 15, 1940, and that about a month after she had been there he called to see her, and, quoting from her

testimony, "he wanted me to give up my job." I also quote the following from her testimony in this connection:

"Q. State whether or not as a result of your not giving up your job immediately, as requested by him, did this seem to anger him any? A. Yes, it did, he wanted me to go home that very same day and give up my job without giving them notice, which I could not do, in view of the fact that some day I might want to work again and could not get any references.

"Q. Did you agree to go later, after you could give the proper notices, etc.? A. Yes.

"Q. Did that satisfy him? A. Yes."

While the last question appears from the foregoing quotation to have been answered "yes", a similar question to Mrs. Young a little later on is answered "no". But whatever may be the correct answer, there is no evidence that Mrs. Young took any steps in the way of giving notice to her employer or seeking a release, or that she did anything looking toward compliance with the request of her husband that she return to his home.

Mrs. Young testifies that within a week thereafter Mr. Young again called to see her at Rock Hill, accompanied by three friends of his, and presented to her an agreement in writing which was introduced in evidence, the same being a separation agreement, and this agreement was signed by Mr. and Mrs. Young and bears date June 29, 1940, and purports to discharge each of them respectively from their marital obligations, in the usual terms of an instrument of that character, reciting that they desired mutually to separate and no longer to reside together as man and wife. There was no consideration shown by the agreement, except, of course, the mutual covenants of the respective parties.

It is contended in behalf of Mrs. Young that she signed this instrument under duress, but the only complaint she makes in her testimony is that her husband caused the paper to be previously prepared, and presented it to her in the presence of the three persons who accompanied him, and that

he refused to allow her "a few minutes privacy" in which to consider it. In this connection, I quote the following excerpts from her testimony:

"Q. You signed this agreement here freely and voluntarily? A. Yes, I asked him when he came up for me to sign the paper, I asked him for a few minutes privacy and he would not grant it to me, so we had three witnesses there the entire time, about a half-hour.

"Q. You said in this agreement here that you signed that he owed you no further duty to support you? A. Yes.

"Q. You meant that at the time, is that so? A. At the time, yes.

"Q. Since his death do you want to change that? A. No.

"Q. And you recognized your obligation under this separation agreement, did you not? A. Yes.

"Q. You don't try to rescind that which you entered into, in this contract, do you? A. No.

"Q. Because you freely and voluntarily signed it, did you not? A. Yes.

"Q. No one made you sign it? A. No.

"Q. You knew what you were signing? A. Yes."

She also testified, however, that Mr. Young's request that this agreement be signed shocked her greatly.

There were two other letters introduced in evidence written by Mrs. Young to Mr. Young, but the record before me does not show the dates of these letters. I gather from Mrs. Young's testimony that the first of them (which was marked Exhibit D) was written about a week after the separation agreement. Both of these letters are quite friendly in tone, and the first one indicates that Mr. Young had again asked her to return to his home notwithstanding the separation agreement. Indeed, she says with reference to this letter: "That was written one week after I signed the separation papers. Q. Had he asked you to come back to him? A. Yes." But she says in this letter, among other things: "I know I can never come back to you as a devoted wife, so

the sooner we adjust to different paths the better off we'll both be." And, referring to this letter, she testified: "Everything I said in this letter is the truth."

In the second letter (Exhibit E) written later, she requested him to deliver to a friend of hers certain of her personal belongings which she had left in the apartment and to send her trunk to her home in Bamberg. In this letter she says, among other things: "I hate to ask any more favors of you, because you've been too swell already, but that seems to be the only way of getting my things where they will be out of your way."

She testified with reference to those two letters that some of the expressions therein contained were "spite words" and "sarcasm". But there is nothing in the words used in the letters or in the context to support such an interpretation.

Indeed, after prolonged and painstaking consideration of the testimony of Mrs. Young as a whole, I cannot escape the conclusion that she voluntarily chose to live separate and apart from her husband without any good and sufficient reason. She left him voluntarily and later failed or refused to respond to his repeated requests to return to his home. Even if the separation agreement be entirely disregarded, it seems obvious that she had already created the status of separation. In other words, the agreement was not for a future separation but a mere recognition of a separation which had been accomplished by her own voluntary act.

Counsel for the respondent is correct in the view expressed in his well prepared brief that the Courts will carefully scrutinize separation agreements, citing among other authorities the case of *Boswell v. Boswell,* 161 S. C., 358, 159 S. E., 652, where the Court set aside a separation agreement because of inadequate consideration, and if there was nothing before me here other than the separation agreement it might be deemed inconclusive, but as above stated, we may disregard it entirely, and yet the only reasonable inference, in my judgment, which may be drawn from the testimony is that Mrs. Young was living apart from

her husband at the time of his death without justifiable cause and hence cannot be deemed his widow or dependent upon him for support, within the meaning of the Compensation Act.

It will be borne in mind that the compensation afforded by this Act is statutory in character, and the right of any claimant thereto is dependent upon the terms and conditions of the Act.

It is true that the North Carolina Supreme Court, in the case of *Martin v. Glenwood Park Sanitarium,* 200 N. C., 221, 156 S. E., 849, held that Section 39 of their Compensation Act should be construed without regard to subdivision (o) of Section 2, defining the term "widower"; both of these sections being identical with those in our Act. The Court held that in Section 39, the Legislature emphasized its intention that a widower should be conclusively presumed to dependent upon his wife, and that this section was in this respect in conflict with subdivision (o) of Section 2, and that the last section in point of time should control. In other words, the Court practically read out of the Act the definition of "widower".

While this case relates to subdivision (o) defining the term "widower", the reasoning of the Court might apply equally to subdivision (n) defining the word "widow". But after carefully considering this decision, which while, of course, not binding, is entitled to great respect, I am unable to concur in the views therein expressed; for it seems to me that when Section 39 is construed in connection with subdivision (n) of Section 2, there is no conflict whatever. Section 39 uses the term "widow" without qualifying or defining it for the simple reason that it had already been specifically defined in subdivision (n) of Section 2. The very purpose of giving these definitions at the beginning of the Act was to obviate the necessity of defining and qualifying these terms throughout the various subsequent sections of the Act. And the context of Section 39 does not justify disregarding the definition of widow. To adopt the

views of the North Carolina Supreme Court as indicated by the case cited would in my opinion defeat the intention of our Legislature in the particulars involved in the instant case.

While the facts of the case of *Lytle v. Southern Ry.-Carolina Division,* 171 S. C., 221, 171 S. E., 42, 90 A. L. R., 915, which involved the Federal Employers' Liability Act, are quite different from those in the case at bar, yet that decision shows that the term "widow" may be given "a restricted rather than a literal meaning" if that be the manifest legislative intention.

In reaching the conclusion above indicated with reference to this appeal, I have of course been mindful of the statutory rule that the Industrial Commission is the fact finding body, and that I am only concerned with errors of law, but of course a conclusion of fact which has no reasonable basis in the evidence is an error of law.

It is quite true that there are cases where the conflicts in the evidence of a single witness are so definite and sharp that a factual issue is presented for the determination of the fact finding body. But there is another rule which should not be overlooked, and that is that the testimony of the witness must be read and considered as a whole and that if upon such consideration there is only one reasonable conclusion that can be drawn therefrom any contrary finding would be error of law. *Chapman-Storm Lumber Corporation v. Minnesota-South Carolina Land & Timber Co.,* 183 S. C., 31, 190 S. E., 117.

The statement is sometimes made with reference to cases tried by juries and the findings of the Industrial Commission upon compensation claims that the Appellate Court is bound by what is termed the scintilla rule but the true meaning of this rule is well expressed in the case of *Turner v. American Motorists Insurance Co.,* 176 S. C., 260, 180 S. E., 55, 57, as follows:

"In the case of *Taylor v. Atlantic Coast Line Railway Co.,* 78 S. C., 552, 556, 59 S. E., 641, 643, this Court said: 'A scintilla of evidence is any material evidence that, if true,

would tend to establish the issue in the mind of a reasonable juror.' (Italics added.)

"Whilst adhering to the scintilla rule, this Court has recognized a rule supplemental to the scintilla rule, which is thus propounded in the case of *National Bank v. Thomas J. Barrett, Jr., & Co.*, 173 S. C., 1, 174 S. E., 581, 582: "If it be conceded that there may be deducted by a process of unusual finesse of reasoning that there is a scintilla of evidence * * * nevertheless there is another rule, more founded upon common sense and reason, to the effect what when only one reasonable inference, not just one inference, but one reasonable inference, can be deduced from the evidence, it becomes a question of law for the Court, and not a question of fact for the jury.' "

I am, therefore, of opinion that the award of the South Carolina Industrial Commission in favor of Mrs. Jane Watson Young, as the widow of S. K. Young, deceased, should be set aside and reversed, and that such award should be adjudged payable to the next-of-kin of the deceased, the appellants herein. And it is so ordered.

*Mr. J. Carl Kearse,* of Bamberg, and *Mr. Carlisle Roberts,*

*Mr. George W. Keels,* of Florence, for respondent,

Counsel for appellant, in reply brief,

The opinion of the Court was delivered by CIRCUIT JUDGE WM. H. GRIMBALL, ACTING ASSOCIATE JUSTICE.

This Court being satisfied with the correctness and reasoning of the well considered order of Honorable L. D. Lide, Judge of the Twelfth Circuit, from which order this appeal is taken, we adopt said order as the opinion of the Court, and direct that it be published herewith.

The appeal is hereby dismissed.

MR. CHIEF JUSTICE BONHAM and MESSRS. ASSOCIATE JUSTICES BAKER, FISHBURNE and STUKES concur.