18373

I. E. DAVIS, Jr., Respondent, v. G. H. NIEDERHOF and West Virginia Pulp and Paper Company, Appellants.

(143 S. E. (2d) 367)

*Messrs. Connor & Connor,* of Kingstree, and *Robinson, McFadden & Moore,* of Columbia, *for Appellants,*

*Messrs. Nettles & Thomy,* of Lake City, and *Yarborough & Nettles,* of Florence, *for Respondent,*

194

*Messrs. Connor & Connor,* of Kingstree, and *Robinson, McFadden & Moore,* of Columbia, *for Appellants, in Reply,*

July 6, 1965.

BRAILSFORD, Justice.

This action for slander resulted in a verdict for I. E. Davis, Jr., in the sum of $6,000.00 against West Virginia Pulp and Paper Company and C. H. Niederhof, who is chief of the corporation's wood procurement division in this State. The defendants have appealed from an order of the Circuit Court denying their motion for judgment notwithstanding the verdict. They abandoned their alternative motion for a new trial in the court below and the only issue before us is whether the court erred in overruling the defendants' motion for a directed verdict, which rested upon three grounds: (1) That the statement made by Niederhof was not slanderous. (2) That the statement was true. (3) That the statement was made on a privileged occasion, in good faith and without malice.

Davis became manager or operator of West Virginia's woodyard at Lake City, South Carolina, in 1956 and continued in this employment until he was discharged on October 6, 1961. It was Davis' duty, by a process of measurement called scaling, to calculate the cordage in each load of wood delivered to the yard, keep inventory records, make reports, ship wood to the mill in Charleston, etc. Davis was the only regular employee at the woodyard, which, except for casual labor, was a one man operation. Persons making deliveries of wood to the yard were paid on the basis of Davis' scaling. When the wood arrived by rail at the paper mill in Charleston, it was again scaled. The results of calculations made at the mill were compared with figures reported by Davis on a weekly basis, not lot by lot or car by car. If the woodyard shipped five cars during a week, the comparison made was the aggregate volume of wood in these cars as measured at the mill with the aggregate volume reported by the woodyard as having been shipped during the week. This procedure was followed by West Virginia with respect to wood from all of its woodyards.

Experience has shown that some differential between the woodyard and mill calculations is to be expected and a variation up to one per cent, over or under, is considered normal. When the measurement at the mill indicates a lesser volume of wood than that at the yard, an entry is made in red ink. When the converse is indicated, the differential is entered in black. The yard manager is accordingly said to be either in the red or in the black. The differential between Davis' figures and the volume of wood as scaled at the mill was about average from 1956 to June 30, 1961, when he commenced to run consistently in the red, an average of about six per cent according to Niederhof's testimony. The record affords no explanation of why these shortages developed. They persisted until the date of Davis' discharge.

West Virginia purchases most of its wood from independent pulpwood dealers. However, during the period in question, there was in operation what is referred to in the

record as the direct purchase program or project, which involved the purchase by West Virginia of tracts of standing timber and contracts with independent producers to cut the trees into pulpwood and deliver the wood to the mill or to a woodyard, depending upon location. The allegedly slanderous words were spoken by Niederhof on August 23, 1961, at a regular monthly meeting of direct purchase program timber buyers. These buyers also negotiated contracts with pulpwood producers and supervised their performance. The main purpose of these meetings was to review the producer accounts with the supervisor of the program and to discuss generally any problems of the program. Niederhof usually attended and made a short talk. According to the allegations of the complaint, which are supported by testimony, on the occasion in question, he made the following statement while addressing the group of buyers:

"We are having trouble at Lake City. It looks like another Darlington situation, only there is a shortage of scale not inventory. We are now in the process of reclaiming all the inventory wood to see just how much of a shortage there is."

Those present at the meeting knew that a serious shortage of wood, involving some six hundred cords worth about $12,000.00, had developed at the Darlington Woodyard, and that the manager of the yard had been dismissed under strong suspicion of stealing. They also knew that Davis, usually referred to by the witnesses as Sonny, was operator of the Lake City Woodyard.

Four of the persons present at this meeting, including the supervisor of the direct purchase program, testified that, in the light of these extrinsic facts, they regarded Niederhof's statement as an accusation that Davis was guilty of stealing pulpwood. Such a charge is, of course, actionable, absent a sufficient defense.

Furthermore, "(i)t is well settled that a crime need not be charged *eo nomine* for the words to be actionable.    *    *    *    'Any words which distinctly as-

sume or imply the plaintiff's guilt, or raise a strong suspicion of it in the minds of the hearers, are sufficient.' " *Porter v. News and Courier Company,* 237 S. C. 102, 108, 115 S. E. (2d) 656, 658, 659. "It is only necessary that the words should, of themselves, or by reference to extraneous circumstances, be capable of the offensive meaning attributed to them." *Williamson v. Askin and Marine Co.,* 138 S. C. 47, 53, 136 S. E. 21, 23. *Lily v. Belk's Department Store,* 178 S. C. 278, 285, 182 S. E. 889, 892.

"(T)he alleged slanderous words used must be given their ordinary popular meaning, and if they are susceptible of two meanings, one slanderous and the other innocent, it must be left to the jury to determine from all of the circumstances attending the publication, in what sense the defendant used them." *Nettles v. MacMillan Petroleum Corporation,* 210 S. C. 200, 42 S. E. (2d) 57, 59. In such a case, the testimony of persons who heard the words uttered as to the sense in which they understood them is admissible. *Morgan v. Livingston,* 2 Rich. Law 573, 31 S. C. L. 573; *Nettles v. MacMillan Petroleum Corporation,* 210 S. C. 200, 205, 42 S. E. (2d) 57, 58.

Applying the foregoing principles, we are satisfied that the words spoken by Niederhof, in the light of extrinsic circumstances, were susceptible of the defamatory meaning attributed to them in the complaint, and that the issue of whether they were uttered and understood in this sense was properly submitted to the jury. In truth, able and candid counsel for the defendants conceded in oral argument that a jury issue would have been presented if the comparison to the Darlington situation had not been mitigated by Niederhof's explanation that at Lake City the shortage was in scale rather than inventory. It is contended that this explanation eliminated any inference of an intention to charge that the shortage resulted from Davis' dishonesty, as distinguished from his negligence or inefficiency. We disagree.

True, a number of witnesses, perhaps all who were examined on the point, testified that it was quite usual for a

yard manager to be short in his scale and that to say that this was so carried no imputation of dishonesty. However, this testimony related to less dramatic variations than Davis' plunge into the red commencing June 30, 1961. Necessarily so, because to say that a differential of up to one per cent, over or under, is normal, is also to say that a persistent shortage of six per cent is abnormal. The persons present at the meeting of August 23 knew that Niederhof would not have referred to a normal shortage as "trouble at Lake City," or compared it with the "Darlington situation." The testimony that a shortage in scale is normal and involves no imputation of dishonesty, while abstractly true, did not take into account the verbage of the statement complained of in the light of extrinsic circumstances.

Pulpwood awaiting shipment on the various West Virginia woodyards is stored in bundles. An inventory is kept by the yard manager, and a physical check of the bundles and records is made from time to time by a representative of West Virginia. Apparently, the shortage at Darlington involved bundles of wood found to be missing on a physical check of the yard. Thus, it could be demonstrated that the shortage in volume resulted from a shortage in bundles. Niederhof referred to this as a shortage in inventory.

Similar inspections at Lake City consistently resulted in a balance between the recorded inventory and a physical count of the bundles. The shortage developed when the wood was measured after its arrival in Charleston. It could not be demonstrated that this shortage in volume resulted from the loss of bundles of wood and Niederhof chose to refer to it as shortage in scale. However, in both instances the yard manager failed to account to West Virginia for wood entrusted to him and in both the employer was out of pocket the value of the wood.

Apparently, the bundles of wood lost their identity ■ when loaded for shipment by freight. At least, no effort was made to count them on their arrival at the

mill so as to compare the number of bundles with the number reported as shipped from the woodyard. Of course, this does not eliminate as a possible cause of the difference in volume a fraudulent failure of the woodyard operator to place on the cars the number of bundles reported as shipped. We are satisfied that the statement complained of, considered as a whole, in the light of extrinsic circumstances known to the hearers, was susceptible of a slanderous meaning. The issue was properly submitted to the jury.

The second ground of the motion—that Niederhof's statement was true—is without merit. The defendants did not plead justification and made no effort to prove the truth of Niederhof's statement in the sense in which the jury has found that it was spoken and understood.

The third ground of the motion for a directed verdict was that the meeting at which Niederhof's statement was made was a qualifiedly privileged occasion and the statement was made in good faith and without malice.

The meeting of August 23 was attended only by employees of West Virginia engaged in wood procurement. Niederhof, six wood buyers and three employees in supervisory positions were present. It may be conceded that the meeting was a qualifiedly privileged occasion, and that a good faith communication which did not go beyond the occasion would likewise have been privileged. However, the protection of a qualifiedly privileged occasion extends only to a proper exercise of the privilege. We quote from *Fulton v. Atlantic Coast Line Railroad Co.,* 220 S. C. 287, 297, 67 S. E. (2d) 425, 429:

"* * * The privilege does not protect any unnecessary defamation. In order for a communication to be privileged, the person making it must be careful to go no further than his interests or his duties require.

"Where the person exceeds his privilege and the communication complained of goes beyond what the occasion demands that he should publish, and is unnecessarily defama-

tory of plaintiff, he will not be protected. And the fact that a duty, a common interest, or a confidential relation existed to a limited degree, is not a defense, even though he acted in good faith. * * *"

Of the persons attending the meeting, the six wood buyers had no connection with, duty toward or responsibility for the operation of the Lake City woodyard. Each buyer was assigned to a woodyard area to which the producers with whom he contracted delivered pulpwood. However, the woodyard managers were responsible to a district superintendent and the buyers had no authority with respect to the woodyards. Incidentally, the buyer assigned to the Lake City area, a Mr. Douglas according to Niederhof's testimony, had discontinued his efforts to purchase timber about the middle of July, 1961, and was not present at the meeting.

Under these circumstances it could not be said as a matter of law that Niederhof had an interest or duty in making the communication complained of at this meeting. It was for the jury to say whether the communication exceeded the privilege and was an unnecessary defamation of Davis.

The verdict has resolved all conflicts in the evidence in favor of respondent. As is our duty in passing upon the issues before us, we have considered only the evidence tending to support the verdict and that in the light most favorable to respondent.

Affirmed.

TAYLOR, C. J., and MOSS, LEWIS and BUSSEY, JJ., concur.