278 S.C. 12 (1982)
292 S.E.2d 23
James JONES, Appellant,
v.
The SUN PUBLISHING COMPANY, INC., Respondent.
21680
Supreme Court of South Carolina.
March 30, 1982.
*13 Stevens, Stevens & Thomas, Myrtle Beach, for appellant.
McCutcheon & McCutcheon, Conway, and Robinson, McFadden, Moore & Pope, Columbia, for respondent.
March 30, 1982.
HARWELL, Justice:
Appellant initiated this suit for libel because respondent published an article which erroneously reported that appellant had pled guilty to charges of copyright infringement. A verdict of $35,000 actual damages was returned by the jury in favor of appellant. Concluding that the evidence failed to establish the respondent's negligence, the trial judge granted the respondent a judgment non obstante veredicto. Appellant alleges it was for the jury to determine whether the publication of the false and defamatory matter was occasioned by any legal fault by the publisher. We agree.
In November 1975, appellant and his father and uncle along with two other individuals were arrested and arraigned on charges of "pirating" stereo tapes in violation of the copyright laws. (Appellant, his father, and his uncle all had the surname Jones.) Respondent reported these events in an article published on November 21, 1975. Two months later, appellant's father and uncle entered guilty pleas as part of a plea bargain which resulted in dismissal of the charges against appellant.
*14 Respondent's reporter telephoned the U.S. Attorney's office and spoke with the attorney who later prosecuted the case against appellant's father and uncle. The respondent then erroneously reported that appellant was among those who had pled guilty. The respondent contended that its reporter garnered the erroneous information from the U.S. Attorney and printed the article in reliance upon the misinformation. However, there was testimony from which the jury may have fairly determined that the information was correctly conveyed to the reporter but erroneously reported by him.
Under settled principles, this Court's scope of review in a case of this nature is limited. In a law case, tried by a jury, the jurisdiction of this Court extends merely to the correction of errors of law, and a factual finding of the jury will not be disturbed unless a review of the record discloses there is no evidence which reasonably supports the jury's findings. Townes Associates, Ltd. v. City of Greenville, 266 S.C. 81, 221 S.E. (2d) 773 (1976). Moreover, in reviewing the propriety of an order granting judgment N.O.V., we are bound to review the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. See cases collected in 3 S.C. Digest, Appeal & Error, Key No. 934(1).
Although the attorney testified that he had confused the various Joneses in his own mind on a previous unrelated occasion, he stated the records were in front of him when he spoke to the reporter on the telephone. Moreover, he testified he did not have a "specific recollection" of what he said to the reporter.
It is undisputed appellant's name did not appear on the public record as having pled guilty. Since the U.S. Attorney could not recall what he conveyed to Monk, the defendant's reporter, over the telephone, but testified that he read the names directly from the record, a jury issue was created as to whether the U.S. Attorney erred in reading the names to Monk or whether the reporter erred in writing them down. The testimony supports the jury's apparent finding that Williams, the U.S. Attorney, read the correct names to Monk but that Monk erred in writing them down.
Moreover, the jury could have also inferred that Monk departed from acceptable standards of reporting when he *15 failed to check the public record himself, rather than relying on information supplied over the telephone. Williams testified the records were open to the public and that Monk could have read from them himself. Additionally, the six day hiatus between the guilty pleas and the publication of the defamatory article negates any rush by respondent to print "hot news." The jury could have reasonably concluded that Monk's failure to make an independent investigation, either by checking the public records himself or contacting the Joneses, with whom he was acquainted, was negligence.
Here, there was no claim or proof that appellant Jones was either a public official or a public figure; hence, under the reasoning of Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed. (2d) 789 (1974), appellant was required only to establish some measure of legal fault by the publisher in order to warrant submission of the matter to the jury. The critical language in Gertz is as follows:
"We hold that so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U.S. at 346, 94 S.Ct. at 3010.
The Gertz Court rationally differentiated between the standard to be applied to public officials and public figures on the one hand, and private individuals on the other. The former, due to their significantly greater access to the communication network, have an infinitely greater ability and opportunity to counteract false statements than do private individuals. Commenting on the private individual's right to recover upon a less stringent standard than that imposed on public officials and public figures, the Court stated:
"He (the private individual) has not accepted public office or assumed an `influential role in ordering society'... He has relinquished no part of his interest in the protection of his own good name, consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public *16 officials and public figures; they are also more deserving of recovery." (Emphasis supplied). 418 U.S. at 345, 94 S.Ct. at 3010.
This Court has never before extended a qualified privilege to a publisher who inaccurately reports the contents of judicial proceedings. See Lybrand v. The State Co., 179 S.C. 208, 184 S.E. 580 (1936); McClain v. Multimedia, Inc., 275 S.C. 282, 270 S.E. (2d) 124 (1980). As stated by Prosser, Handbook of the Law of Torts, p. 832 (4th Ed. 1971):
"[I]t has always been held that the report must be a fair and accurate one, and the privilege does not cover false statements of facts as to what has occurred, or mistakes in the names of parties, or the interpolation of defamatory matter, or a one-sided account." (Emphasis supplied).
In Lybrand and McClain, supra, there was no assertion the article in question was not a fair and impartial report of pleadings filed with the court and malice was thus required to defeat the privilege. We recognized, however, the United States Supreme Court holding in Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed. (2d) 154 (1976), that liability may attach where a publisher fails to accurately reproduce the contents of public records. McClain, supra, note 2.
The United States Supreme Court in Firestone, supra, soundly rejected the precise argument which the trial judge accepted here. In Firestone, Time Magazine reported on the domestic litigation between an industrial magnate and his estranged wife. Mary Alice Firestone sued her husband for separate maintenance and her husband counterclaimed for divorce on the grounds of extreme cruelty and adultery. The Florida divorce court granted the counterclaim and the divorce, though it did not find that Mrs. Firestone was guilty of either extreme cruelty or adultery. Time reported the divorce was granted on the grounds of extreme cruelty and adultery. Mrs. Firestone was awarded a jury verdict in her subsequent defamation action.
Although the Supreme Court reversed and remanded because the issue of fault had not been submitted to the jury as *17 required by Gertz, it rejected arguments by Time that the New York Times privilege be extended to all reports of judicial proceedings. The Court stated:
"Petitioner would have us extend the reasoning of Cox Broadcasting [v. Cohen, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed. (2d) 328] to safe guard even inaccurate and false statements, at least where `actual malice' has not been established. But its argument proves too much. It may be that all reports of judicial proceedings contain some informational value implicating the First Amendment, but recognizing this is little different from labeling all judicial proceedings matters of `public or general interest,' as that phrase was used by the plurality in Rosenbloom [v. Metromedio, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed. (2d) 296]. Whatever their general validity, use of such subject-matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods may too often result in an improper balance between the competing interest in this area. It was our recognition and rejection of this weakness in the Rosenbloom test which led us in Gertz to eschew a subject-matter test for one focusing upon the character of the defamation plaintiff." 424 U.S. at 456, 96 S.Ct. at 966.
The record here does not support the trial court's conclusion that a public official supplied false information to respondent's reporter. Instead, a jury question was presented as to whom was at fault in publishing the erroneous article. The trial judge was in error in substituting his view of the facts for those found by the jury. We reverse and reinstate the jury verdict.
Reversed.
NESS and GREGORY, JJ., concur.
LEWIS, C.J., and LITTLEJOHN, J., dissent.
LEWIS, Chief Justice (dissenting):
*18 The majority opinion reverses the judgment non obstante veredicto entered by the trial court. It does so by: (1) discovering a jury issue which I am unable to find in this record; and (2) announcing a principle of law for which I know of no authority. I must, therefore, dissent.
The majority finds a jury question in the testimony concerning a long-distance telephone conversation between Monk, reporter for the respondent newspaper, and Williams, the Assistant United States Attorney. What occurred during this conversation is indeed crucial to the outcome of this case, for somehow during the call the plaintiff's name became identified as one of the Joneses who was pleading guilty to federal charges. Either Williams made a mistake in reciting the names to Monk or Monk made a mistake in taking the names from Williams.
The testimony of Monk is unequivocal. He states that he was given the name "James Jones" (plaintiff) not "Jack Jones" (plaintiff's uncle) and that he wrote his article accordingly. Monk's notes, preserved and introduced as evidence, clearly show "James Jones" and not "Jack Jones."
The critical testimony of Williams should be set out here for examination:
Q. (by the Court): Alright, he's asking you, sir, if you stated to [Monk] the name of James Jones or what did you say, if you have a recollection?
A. I do not have a specific recollection of what I said.

* * *
Q. Did you, at any time, read the name, James Jones, as having pled guilty to this indictment?
A. I do not know.
Q. You don't know that, sir, and you read from the record?
A. I presume ....
Q. You don't know right on?
A. That's right.

* * *
Q. If I understand what you told me, you read from the record, public record, is that right, sir, to Mr. Monk?

*19 A. I did. There's no saying that I did not make a mistake in so reading them.
Q. ...I'm not asking you if you made a mistake. So far as you know, you told him what was on the records?
A. So far as I know, I told him what was on the record and that was my intent.

* * *
Q. Could you have made a mistake in your conversation with Mr. Monk?
A. Yes, sir.
Q. Did you make a mistake, sir?
A. I don't know.

* * *
The witness says he does not know what he said. If he testified truthfully, the jury could only conclude that he did not remember. His actual words would remain a matter of pure speculation. If his testimony was not true, and he was merely feigning forgetfulness, the jury would still have no basis for any finding as to Williams' actual statement to Monk. Even in the exercise of reasonable conjecture, as the majority would have the jury do, the only reasonable conclusion is that it was Williams not Monk who made the mistake, given his admission that he had confused the Jonese before.
The majority insists, however, that this testimony (which stands utterly alone) requires submission of the case to the jury and sustains a verdict upon the premise that Monk improperly recorded the names. The testimony evidences nothing of the kind; in fact, it is evidence of nothing at all.
Certainly, the testimony of Williams, that he did not remember what he told Monk, would have no probative value in establishing what he did tell Monk. Likewise, it could have no probative value in refuting the statement of Monk as to what Williams did say.
South Carolina adheres to the "scintilla of evidence" rule which requires submission of an issue to a jury whenever there is competent and relevant evidence tending to establish the issue in the mind of a reasonable juror. The rule does not authorize submission of speculative, theoretical or hypothetical views nor does it permit a verdict to stand upon surmise, *20 conjecture or speculation. Turner v. American Motorists Ins. Co., 176 S.C. 260, 262-263, 180 S.E. 55; McMillan v. Southern Ry. Co., 196 S.C. 373, 376, 13 S.E. (2d) 915; Young v. Hyman Motors, Inc., 199 S.C. 233, 242-243, 19 S.E. (2d) 109; In re Crawford, 205 S.C. 72, 91-92, 30 S.E. (2nd) 841; Johnson v. Metropolitan Life Ins. Co., 206 S.C. 415, 419-420, 34 S.E. (2d) 757; Bell v. Bank of Abbeville, 211 S.C. 167, 173, 44 S.E. (2d) 328; Marks v. Industrial Life and Health Ins. Co., 212 S.C. 502, 505-506, 48 S.E. (2d) 445; Fagan v. Timmons, 215 S.C. 116, 121, 54 S.E. (2d) 536; Tallon v. Seaboard Coast Line Railroad Co., 270 S.C. 362, 365, 242 S.E. (2d) 418; Bradburn v. Colonial Stores, Inc., 273 S.C. 186, 255 S.E. (2d) 453; Taylor v. Bryant, 274 S.C. 509, 265 S.E. (2d) 514; Bultman v. Barber, S.C. 281 S.C. 2d 791; Whisenant v. James Island Corporation, S.C. 281 S.E. (2d) 794.
Under these prior cases, and others, our Court has deemed evidence relevant and/or competent according to its tendency to establish material issues between the parties. We have even, as these decisions show, permitted circumstantial evidence to outweigh opposing direct evidence, but this is the first case in my experience in which the Court has erected a jury issue upon testimony from which no material inference can be drawn. The precedent here established is a decidedly dangerous one.
Equally disturbing is the apparent adoption by the majority of a principle of law for which I can find no authority. The trial judge concluded that the defendant had no duty of further inquiry after receiving information from a reliable public official in a routine manner and in the conduct of his official duties. Justice Littlejohn had quoted the relevant language of the trial court in his separate dissent herein. To his opinion I would simply add some observations drawn from other jurisdictions. The facts of this case are new to South Carolina, but they have arisen elsewhere with courts uniformly reaching the opposite result from that which our Court announces today.
Official sources are indispensable if the public is to be informed, yet official sources do make mistakes. My search reveals cases where authorities have released startling information to the press resulting in wide-spread publication. *21 There have been cases of unexplained misidentification, including release of an innocent person's photograph as a criminal suspect, and even an instance of false identification given by the suspect himself and passed on through the press to the public. See Karp v. Miami Herald Publishing Co., 359 So. (2d) 580 (Fla. App.); LeBoeuf v. Times Picayune Publishing Corp., 327 So. (2d) 430 (La. App.); Wilson v. Capital City Press, 315 So. (2d) 393 (La. App.); Mathis v. Philadelphia Newspapers, 455 F. Supp. 406; Moloney v. Tribune Publishing Company, 26 Wash. App. 357, 613 P. 2d 1179.
In these decisions courts have paid special attention to the following factors: (1) the official source had direct access to the public record or judicial proceeding; (2) the official source was either directly responsible for the investigation or prosecution or was an authorized representative of those responsible; (3) the defendant publishers had previously relied upon the same official source; (4) the defendant publishers had no reason to question the information supplied by the official source; (5) conditions would not permit the defendant publishers to independently verify the information so supplied. In each of the cases just cited at least two of the five circumstances were present, with the result that the defendant publishers were held to be without fault.
This approach strikes what I consider a proper balance between the need to protect private individuals from publication of injurious falsehoods and the need to guarantee vigorous and uninhibited exercise of First Amendment freedoms. The effect of these cases is to create a qualified privilege protecting publishers of defamatory errors or falsehoods when publication is in reliance upon the mistake of an official source. In South Carolina, such a qualified privilege would constitute an affirmative defense to be raised on the pleadings and proved. Rutledge v. Junior Order of United American Mechanics, 185 S.C. 142, 149-150, 193 S.E. 434; Moore v. New South Express Lines, 184 S.C. 266, 269, 192 S.E. 261; Kirby v. Gulf Refining Co., 173 S.C. 224, 228-229, 175 S.E. 535.
The majority has, however, chosen a different path. It is clear from its decision that the majority will impose liability upon a newspaper reporter or publisher upon a theory of negligence whenever such a defendant relies upon an official *22 source who turns out to be mistaken. In the present case the newspaper received information from an Assistant United States Attorney who had access to the public record, who gave every indication he was reading from the public record, who had primary responsibility for the prosecution of the case, and who had earlier supplied reliable information in the matter. Moreover, the testimony shows that the reporter had no reason to doubt the information being supplied nor would it have been practical for him in Myrtle Beach to verify the official records in Florence or Columbia, seventy and one hundred forty-one miles away respectively. I am satisfied that this publication, though unfortunately false, and possibly injurious to the appellant, should be accorded a qualified privilege and not made a basis for liability.
In keeping with my view that this should be an occasion of privilege, I have reviewed the record with an eye to our rule that a qualified privilege may be lost when actual malice is shown. Jones v. Garner, 250 S.C. 479, 487, 158 S.E. (2d) 909; Davis v. Niederhof, 246 S.C. 192, 199-200, 143 S.E. (2d) 367; Rogers v. Florence Printing Company, 233 S.C. 567, 106 S.E. (2d) 258; Bell v. Bank of Abbeville, 208 S.C. 490, 495, 38 S.E. (2d) 641. In South Carolina, actual malice can include a departure by reporters and publishers from "responsible standards of investigation" and the reliance upon "an admittedly unreliable source, without further verification." Stevens v. The Sun Publishing Company, 270 S.C. 65, 72, 240 S.E. (2d) 812, I am at a loss to find any competent evidence of any specific malice on the part of respondent toward the appellant. Likewise, as indicated above, I find no evidentiary basis in this record for holding that the respondent departed from responsible standards of investigation or relied upon a dubious source.
On the basis of the foregoing, I conclude that the trial judge correctly entered judgment n. o. v. for the respondent, and I would accordingly affirm.
LITTLEJOHN, J., concurs.
LITTLEJOHN, Justice (concurring in dissent):
*23 I concur in the result which Chief Justice Lewis reached. To do so I need only agree with the Trial Judge who in granting the motion for judgment n. o. v. said:
There is no evidence in the record that the reporter acted in any way other than as a reasonably prudent reporter would have acted under similar circumstances. The information for the story was obtained from a public official in the course of his official duties. This source had proved reliable in the past and there was no reason to doubt the accuracy of the information released by him on this occasion. The information relating to this criminal proceeding was sought and obtained in the same manner that had been routinely utilized by this reporter and other members of the news media in general practice.
I would hold that there being no fault, there is no liability.