17481

Foster ROGERS, an infant under the age of fourteen years, by his Guardian ad Litem, Malcolm P. Rogers, Respondent, v. The FLORENCE PRINTING COMPANY, Appellant

(106 S. E. (2d) 258)

*Messrs. McEachin, Townsend & Zeigler,* of Florence, *for Appellant,*

*Messrs. H. E. Yarborough, Jr.,* and *John L. McGowan,* of Florence, *for Respondent,*

December 10, 1958.

LEGGE, Justice.

Plaintiff, a minor twelve years of age, brought this action against the publisher of a daily newspaper, seeking recovery of actual and punitive damages in the amount of one hundred thousand ($100,000.00) dollars by reason of its publication, on May 10, 1956, of a defamatory article concerning him. Upon a former appeal, 230 S. C. 304, 95 S. E. (2d) 616, wherein we held that the article was libelous *per se,* its substance was set out in the opinion of this court; it need not be repeated here. The case was tried in September, 1957, before the Honorable J. M. Brailsford, Jr., Presiding Judge, and a jury. Verdict was in favor of the plaintiff for five thousand ($5,000.00) dollars actual and twenty thousand ($20,000.00) dollars punitive damages. Thereafter, by consent of counsel, defendant's motion for a new trial was marked "heard" and was argued in April, 1958. From Judge Brailsford's order of May 17, 1958, overruling that motion, the defendant has appealed.

The numerous exceptions present but three issues, *viz.*:

1. Was the verdict so excessive as to indicate caprice, passion or prejudice on the part of the jury?

2. Was there error in the charge to the jury?

3. Did the trial judge err in refusing to declare a mistrial because of a remark made by plaintiff's counsel in argument to the jury?

On the first of these issues, appellant's counsel direct their argument only against the award of punitive damages. They contend that its amount conclusively shows the taint of caprice, passion or prejudice because:

1. It is unreasonably disproportionate to the award of actual damages;

2. It exceeds the maximum fine for criminal libel under Section 16-161 of the 1952 Code; and

3. There was no evidence of appellant's wealth.

Counsel preface their argument on this issue with the plea that this court should, as a matter of public policy, reject the doctrine of punitive damages. They urge that, since to punish is the function not of the individual litigant, but of the state, and since the plaintiff in a tort action is entitled only to be compensated for his injury, the doctrine is, in fact, that of private vengeance and should be repudiated as illogical and unjust. The short answer to this plea is that it was not, so far as the record here shows, made before the lower court. But, waiving that, we shall discuss it briefly, for it brings into focus the function of this court with respect to the public policy of the state.

The question whether punitive damages should have any place in civil actions has been the subject of numerous legal treatises. Some fifty years ago one author (20 Harvard Law Review 420) said that it had been so often discussed that it was becoming somewhat threadbare. Another (70 Harvard Law Review 517) quotes the opinion of the New Hampshire court, *Fay v. Parker,* 1873, 53 N. H. 342, 382, wherein exemplary damages were denounced as 'a monstrous heresy * * * an unhealthy excrescence, deforming the symmetry of the body of the law."

There is much to be said, and indeed much has been said, in support of appellant's criticism of the doctrine. "It is prob-

able that, in the framing of a model code of damages today for use in a country unhampered by legal traditions, the doctrine of exemplary damages would find no place." McCormick, Damages, Section 77, p. 276.

On the other hand, since fault is usually a necessary ingredient of the defendant's liability in tort, the function of all damages in such cases may be said to be admonitory as well as reparative. In this view, when the defendant's fault has been aggravated by his willfullness or malice, the admonitory function may not be adequately accomplished by the award of compensatory damages only, especially where actual injury to the plaintiff has been slight.

Despite criticism and denunciation of the doctrine, allowance of exemplary damages in cases of willful, wanton or malicious tort has continued to be the rule in most jurisdictions in this country for well over a century. Recognition of the doctrine in South Carolina goes as far back as 1784, when *Genay v. Norris,* 1 Bay 6, was decided. And the dual function of such damages was referred to in *Watts v. South Bound R. Co.,* 60 S. C. 67, 38 S. E. 240, 242, in the following language:

"Exemplary or punitive damages go to the plaintiff, not as a fine or penalty for a public wrong, but in vindication of a private right which has been willfully invaded; and indeed, it may be said that such damages in a measure compensate or satisfy for the willfullness with which the private right was invaded, but, in addition thereto, operating as a deterring punishment to the wrongdoer, and as a warning to others."

And again, in *Beaudrot v. Southern R. Co.,* 69 S. C. 160, 48 S. E. 106, 107, this court, speaking through Mr. Justice Woods, said:

"Punitive damages have now come, however, to be generally, though not universally, regarded, not only as punishment for wrong, but as vindication of private right. This is the basis upon which they are now placed in this state."

The same view has been recently expressed in *Davenport v. Woodside Cotton Mills Co.,* 225 S. C. 52, 80 S. E. (2d) 740. See also *Mock v. Atlantic Coast Line R. Co.,* 227 S. C. 245, 267; 87 S. E. (2d) 830, 840, where the compensatory aspect of such damages was referred to.

But we need dwell no longer upon the rationale, or upon the merits or demerits, of the doctrine. Acquiescence in it for almost two centuries justifies the conclusion that it is now agreeable to, and part of, the public policy of the state.

It is often the function of the courts by their judgments to establish public policy where none on the subject exists. But overthrow by the courts of existing public policy is quite another matter. That its establishment may have resulted from decisional, rather than statutory, law, is in our opinion, immaterial. Once firmly rooted, such policy becomes in effect a rule of conduct or of property within the state. In the exercise of proper judicial self-restraint, the courts should leave it to the people, through their elected representatives in the General Assembly, to say whether or not it should be revised or discarded.

The fact that the verdict for punitive was four times as large as that for actual damages does not of itself compel us to disturb the former. There would appear to be no sound reason for a rule requiring the one to be in definite ratio to the other; no such rule exists in this state. *Eaddy v. Greensboro-Fayetteville Bus Lines,* 191 S. C. 538, 5 S. E. (2d) 281. Cf. *Beaudrot v. Southern R. Co., supra,* in which a verdict for $1,016.66 was sustained where the actual damage was about $2.50; and *Hall v. Walters,* 226 S. C. 430, 85 S. E. (2d) 729, where award of $25,000.00 punitive damages was affirmed, the verdict for actual damages being in the amount of $1,000.00.

Appellant suggests that Section 16-161, setting the maximum fine for criminal libel at $5,000.00, is a legislative expression of the public policy of the state, applicable as well

to punitive damages in civil actions for libel, and that we should, therefore, reverse the award for punitive damages here or remand the cause with directions to the lower court to order a new trial unless the plaintiff remit the excess over $5,000.00. We think the suggestion unsoundly premised. The statute reads as follows:

"Any person who shall with malicious intent originate, utter, circulate or publish any false statement or matter concerning another the effect of which shall tend to injure such person in his character or reputation shall be guilty of a misdemeanor and, upon conviction therefor, be subject to punishment by fine not to exceed five thousand dollars or by imprisonment for a term not exceeding one year, or by both fine and imprisonment, in the discretion of the court; provided, that nothing herein shall be construed to abridge any right any person may have by way of an action for damages for libel or slander under the existing law."

Had the General Assembly intended to limit punitive damages in actions for libel on the civil side of the court, it would have been a simple matter to say so. That it had no such intention seems evident from the proviso just quoted.

Finally, with regard to the alleged excessiveness of the verdict, appellant contends that absence of proof of its wealth impels the conclusion that the award of $20,000.00 punitive damages resulted from caprice, passion or prejudice, and that a new trial should therefore be granted. In *Charles v. Texas Company*, 199 S. C. 156, 18 S. E. (2d) 719, it was held that while the financial worth of a defendant was a fact properly to be considered by the jury in its determination of the amount to be awarded by way of punitive damages, evidence of such worth was not requisite to such award. We also said there that, since information as to his worth was a matter peculiarly within the defendant's possession, he should not be heard to complain that the jury made its award without such information, where he himself testified and did not offer it. Appellant, having asked that we

review that decision, argues that evidence of a defendant's wealth is bound to prejudice his cause; that he should not be compelled, at his peril, to prove his property; and that he should not be presumed wealthy unless the record so warrants. But, despite these arguments, we adhere to the principles stated in the *Charles case* to which we have just referred. Factors other than the defendant's ability to respond to the judgment necessarily enter into the determination of a proper award of punitive damages; in actions such as the present one, for example, the nature of the libel, the extent of the publication, and other circumstances, apparent from the evidence, that may indicate aggravation or suggest mitigation. No precise formula for their measurement being possible, it seems to us that under our system of jurisprudence the rights of both parties are best protected by leaving it to the jury, under proper instructions as to the governing principles of law, to arrive at a fair award of such damages whether or not evidence be offered as to the defendant's financial worth. If their verdict seem overliberal, the trial judge has discretionary power to reduce it; if it appear so excessive as to indicate that it was the result of caprice, passion or prejudice, both the trial judge and this court are under duty to set it aside.

Nor do we think that the amount of the verdict for ■ punitive damages in the instant case justifies the inference that the jury presumed the defendant wealthy. The editor's testimony that the newspaper had a circulation of approximately 15,000 was not necessarily evidence of its wealth; but such widespread publication of the libelous article was a matter properly to be considered by the jury in arriving at the amount of the award. The published article contained grave charges against respondent's character; by their verdict the jury indicated that those charges were, in their judgment, unfounded, and made under such circumstances of aggravation as to warrant the imposition of substantial punitive damages. Such conclusion is not without support in the evidence; and in our opinion the amount

awarded was, regardless of appellant's financial condition, not so excessive as to suggest that it resulted from unwarranted presumption of wealth, or from caprice, passion or prejudice.

By Exception 11 appellant contends that the trial judge erred in refusing to charge the jury that if they should find that articles published in appellant's newspaper subsequent to the one upon which the action was based constituted a retraction of that article, they could not find punitive damages. Refusal of this request was not error. Retraction of a libel is matter to be considered in mitigation, but does not bar punitive damages in the absence of a statute so providing. 33 Am. Jur., Libel and Slander, Sections 121, 122, pp. 121, 122; 53 C. J. S., Libel and Slander, §§ 257, 267 g, pp. 371, 389. Annotations, 13 A. L. R. 794; 13 A. L. R. (2d) 277.

Exception 12 charges that the trial judge erroneously instructed the jury that "as to the question of whether or not the defendant is liable for punitive damages, the burden of proof is upon the plaintiff to establish by the greater weight or preponderance of the evidence that the defendant, through its officers or employees, acted maliciously, that is, with ill-will towards the plaintiff, or that it acted recklessly or wantonly, meaning with conscious indifference toward plaintiff's rights. In the absence of proof of such conduct, punitive damages are not recoverable." Appellant's contention here is that recklessness or wantonness giving rise to implication of malice must be "gross disregard of the rights of the person injured," *Fulton v. Atlantic Coast Line R. Co.,* 220 S. C. 287, 67 S. E. (2d) 425, 429, and that "conscious indifference" is not enough. We find no merit in this contention.

The test by which a tort is to be characterized as reckless, willful or wanton is whether it has been committed in such a manner or under such circumstances that a person of ordinary reason or prudence would then have been conscious of it as an invasion of the plaintiff's rights. *Tolleson v. Southern R. Co.,* 88 S. C. 7, 70 S. E. 311; *Eberle v. Southern R. Co.,* 98 S. C. 89, 79 S. E.

793. It is this present consciousness of wrongdoing that justifies the assessment of punitive damages against the tortfeasor, *State ex rel. Gwynn v. Citizens' Tel. Co.,* 61 S. C. 83, 39 S. E. 257, 55 L. R. A. 139, 85 Am. St. Rep. 870; and it has been variously referred to as "conscious failure to observe due care", *Darlington County Fair & Driving Ass'n v. Atlantic Coast Line R. Co.,* 90 S. C. 436, 73 S. E. 790; as "conscious indifference to the rights of others", *Cox v. Coleman,* 189 S. C. 218, 200 S. E. 762, 764; and as "gross disregard of the rights of the person injured", *Fulton v. Atlantic Coast Line R. Co., supra.* But the common denominator of these expressions is the test before mentioned, *viz.*: that at the time of his act or omission to act the tort-feasor be conscious, or chargeable with consciousness, of his wrongdoing. As was said in *Hicks v. McCandlish,* 221 S. C. 410, 70 S. E. (2d) 629, 631: "We have held in many cases that exemplary damages should not be awarded for mere gross negligence, and that the element that distinguishes actionable negligence from willful tort is inadvertence." Applying this test, we perceive no real difference between "gross disregard of the rights of the person injured," for which appellant contends, and "conscious indifference to the rights of the plaintiff," which the trial judge charged. If any difference could be held to exist, it would seem that the language charged was perhaps the more favorable to the defendant.

By Exception 13, appellant contends that the trial judge erred in charging the jury that their verdict for actual damages "could be any amount from one dollar to one hundred thousand dollars", the error assigned being that the court should have charged that the award for actual damage should be such amount as would compensate the plaintiff for his injury. Earlier in his charge, the trial judge had clearly instructed the jury that actual damages are such as will "compensate him for such injuries as are naturally the proximate result of the defendant's wrongful conduct". It is elementary that the trial judge's charge to the jury is to be construed as a whole. Exception 13 is without merit.

Exception 15 complains that the trial judge, in his order denying the motion for new trial, said, after having discussed certain grounds of the motion: "The remaining grounds all complain of alleged errors in the charge which were not called to the attention of the court", and therefore did not require consideration. Appellant here assigns error "for the reason that errors in the charge do not have to be called to the attention of the court in order to make them grounds of appeal".

We might summarily dismiss this exception (1) as lacking the definiteness required by Rule 4, Section 6, and (2) as not based upon a sound principle of law, Code, 1952, 1958 Supplement, Section 10-1210. But we shall consider it, briefly. It appears from appellant's brief that its contention under this exception is directed to the following colloquy between judge and counsel at the conclusion of the charge:

"The Court: 'Is there anything further for the plaintiff?'

"Mr. McGowan: 'Nothing further.'

"The Court: 'Mr. McEachin?'

"Mr. McEachin: 'We insist on our requests to charge.'

"The Court: 'I understand you do, and I have marked them with a cross mark to show that I have refused them.' "

Where a party has requested that a certain proposition of law be charged and, after opportunity for discussion of it, the trial judge has declined to so charge, it is of course not necessary, in order to preserve the point on appeal, that objection to such ruling be made at the conclusion of the charge. *Smith v. City of Greenville*, 229 S. C. 252, 92 S. E. (2d) 639. But under the exception now before us appellant argues only that the trial judge erred in refusing its request to charge that "the plaintiff would not be entitled to punitive damages in the absence of proof of express malice imputing (*sic*) hatred or ill-will," and in modifying it by adding to the words just quoted: "or imputing (*sic*) such recklessness as to indicate a conscious indifference to the rights of the plaintiff." Such modification was proper. What

we have said in our discussion of Exception 12 disposes also of the question sought to be raised under Exception 15.

Mr. Fred Andersen, who had been appellant's news editor at the time of the publication of the alleged libelous article and who had prepared it for publication, was not in appellant's employ at the time of the trial; his testimony, as a witness for the defense, was taken by deposition, some three months before the trial, in Middletown, Ohio, where he was then living. In the course of argument to the jury, Mr. Yarborough, of counsel for respondent, referring to Mr. Andersen, said that the reason that he was not in court was that "I got too much on him". Appellant's counsel immediately objected and moved for a mistrial. The trial judge overruled the motion and instructed the jury to disregard any statement made by respondent's counsel in argument unless it was supported by the evidence. One of the grounds urged by appellant in its motion for new trial was that the motion for mistrial should have been granted because counsel's statement before mentioned had not been based on the evidence. Referring to this ground, the trial judge, in his order denying the motion for new trial, said: "While I cannot recall the incident perfectly, and the record is not entirely clear, I do remember that Mr. Yarborough was addressing himself to the manifest contradictions between Mr. Andersen's testimony by deposition and that of a number of witnesses who testified during the trial. Mr. Yarborough attributed the statement to these contradictions and I am confident that the jury so understood. Furthermore, the jury was instructed to disregard any statement not supported by the record".

The trial judge's account of the incident, quoted above, is not questioned, and indeed is not subject to question. *State v. Sessions,* 225 S. C. 177, 81 S. E. (2d) 287; *Brown v. Hill,* 228 S. C. 34, 88 S. E. (2d) 838. The motion for mistrial was addressed to his sound discretion. *Mock v. Atlantic Coast Line R. Co.,* 227 S. C. 245, 87 S. E. (2d) 830; *Wynn v. Rood,* 228 S. C. 577, 91 S. E.

(2d) 276. Refusal to order a mistrial in the circumstances just mentioned did not constitute abuse of discretion.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.