Bernice M. STANLEY, Plaintiff,

v.

UNITED STATES of America,
Defendant and First Third-
Party Plaintiff,

v.

MIDWEST CONSTRUCTION CO., Inc.,
First Third-Party Defendant and
Second Third-Party Plaintiff,

v.

PETROLEUM TANK SERVICE, INC.,
Second Third-Party Defendant.

Civ. No. 1783.

United States District Court,
D. Maine, N. D.

July 28, 1972.

Sidney W. Thaxter, Thomas Schulten, James S. Kriger, Portland, Me., for plaintiff.

Peter Mills, U. S. Atty., Portland, Me., Kevin M. Cuddy, Asst. U. S. Atty., Bangor, Me., for the United States.

Mitchell & Ballou, Bangor, Me., for Midwest Construction Co., Inc.

Gene Carter, Richard J. Relyea, III, Bangor, Me., for Petroleum Tank Service, Inc.

## MEMORANDUM OF OPINION AND ORDER OF THE COURT

COFFIN, Circuit Judge.

Plaintiff Bernice Stanley brought this action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq., to recover damages for the allegedly wrongful death of her twenty year old son Vaughn Stanley, who fell to his death while painting a radio tower at the Naval Radio Station in Cutler, Maine. The United States impleaded the prime contractor on the painting project, Midwest Construction Company (Midwest), claiming a right of indemnity. Midwest, in turn, claimed a right of indemnity from Petroleum Tank Service, Inc. (Petroleum), decedent's employer and the subcontractor employed to do the actual painting. Court proceedings were stayed by agreement of the parties pending a final disposition of plaintiff's workmen's compensation claim against Petroleum. The award made in that proceeding was confirmed by the Maine Supreme Judicial Court. Stanley v. Petroleum Tank Service, Inc., 284 A.2d 280 (Me.1971). Subsequently, the United States and Petroleum filed motions for summary judgment, which were denied by this court prior to trial.

■ Subject to the limitations of the Federal Tort Claims Act, Maine substantive law governs plaintiff's entitlement to bring this suit, the liability of the United States, the latter's rights of indemnity, and the measure of damages. 28 U.S.C. § 1346(b). There is no dis-

agreement as to plaintiff's entitlement to bring this wrongful death action, 18 M.R.S.A. § 2551, as decedent's "personal representative", 18 M.R.S.A. § 2552. Plaintiff is decedent's mother and has been stipulated to be the administratrix of his estate.

### Plaintiff's Theories of Liability

Plaintiff now presses two theories of liability: first, that the United States, as a landowner, is liable for the negligence of the independent contractors because the job was an inherently dangerous one; and second, that the United States, again as landowner, was negligent in failing to provide a reasonably safe place to work.[1]

■ In greater detail, plaintiff's first theory of liability, based on the Restatement (Second) of Torts § 423, is that the United States should be held liable for the negligent failure of Midwest or Petroleum adequately to train, equip and supervise Stanley. Section 423 provides:

"One who carries on an activity which threatens a grave risk of serious bodily harm or death unless the instrumentalities used are carefully constructed and maintained, and who employs an independent contractor to construct or maintain such instrumentalities, is subject to the same liability for physical harm caused by the negligence of the contractor in constructing or maintaining such instrumentalities as though the employer himself had done the work of construction or maintenance."

Passing the question of the applicability of § 423 to the facts of the present case and assuming negligence on the part of Midwest or Petroleum, the claim must fail, for the United States has not waived sovereign immunity as to such

---

1. Negligence in selecting a contractor has apparently been abandoned in plaintiff's post-trial memorandum, and properly so in view of the absence of evidence. An allegation of the government's failure to maintain adequate supervison over the contractor has not been pressed. This again seems sensible in the absence of evidence of retained control beyond the right to inspect and object. *See* W. Prosser, Handbook of the Law of Torts § 71 (4th ed. 1971). Finally, an allegation of an inadequate number of contract inspectors is rightfully not relied upon, there being no evidentiary basis for the claim.

claims. The Supreme Court has recently clarified the scope of the waiver of immunity for injury or death "caused by the negligent or wrongful act of omission of any employee of the Government. . . . " 28 U.S.C. § 1346(b). Laird v. Nelms, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). In the *Nelms* case, the Court held that the waiver did not extend to liability for damage caused by sonic booms since such liability would be "strict liability for undertaking an ultrahazardous activity" rather than liability for the wrongful act of an employee. The Court, referring to Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), reaffirmed its view that "Congress intended to permit liability essentially based on the intentionally wrongful or careless conduct of Government employees, for which the Government was to be made liable according to state law under the doctrine of *respondeat superior*. . . ." 406 U.S. at 801, 92 S.Ct. at 1901. While plaintiff insists on a distinction between ordinary strict liability and the liability defined in § 423, it is clear that the latter is nevertheless not predicated on the wrongful act of an "employee of the Government".[2]

■■ Plaintiff's second theory of liability is that the United States breached its duty as owner of the land and towers to use due care to provide its business invitees a reasonably safe place to work. As independent contractors working for the government, both Midwest and Petroleum are under Maine law business invitees of the government, as are their employees, including decedent. Levesque v. Fraser Paper Ltd., 159 Me. 131, 136–138, 189 A.2d 375 (1963). As stated recently by the Maine Supreme Judicial Court, the owner of property has a duty to a business invitee "to exercise due care to have its premises in a reasonably safe condition and to give warning of latent or concealed perils." Jamieson v.

Lewiston-Gorham Raceways, Inc., 261 A.2d 860, 862 (Me.1970).

*Factual Background*

Before considering whether the United States exercised the required due care in these respects, it is necessary to describe the setting and ascertain how the accident took place. The testimony of co-workers Armstrong and Geel and of the plaintiff establish that decedent, who had no prior experience working on high structures, first came to work at Cutler Naval Radio Station on August 11, 1967, the day before his death, and that on both August 11 and August 12 he was painting on Tower S–O, owned and operated by the United States as part of the radio facility. The tower itself, as detailed in specifications and photographs, has an overall height of 979.5 feet. It is supported by three "legs", twelve feet apart, to which are attached triangular horizontal platforms at intervals of approximately seventy vertical feet. A ladder extends from each platform to the next one, no two succeeding ladders being in line with one another. The platform at the upper end of any given ladder has a ladder hole two and one-half feet wide and three feet long. The ladder projects four and one-half feet above the platform against one of the shorter sides of the hole, but apart from this projection the ladder hole is unguarded.

The testimony of Armstrong and Geel, who were painting structural steel ten to fifteen feet above the platform at height 705.5 feet, was that decedent, when last noticed from one to several minutes before the fall, was standing on that platform and was painting one of the legs of the tower with a roller which had been affixed to a five to six foot long handle. The open ladderway was three feet from this corner, most but not all of the space between being filled by a grating. The witnesses' attention next being attracted

2. Comment a to § 423 makes clear that liability thereunder may be imposed in the absence of personal fault and "irrespective of whether it is [the sponsor's] negligence or that of a contractor employed by [the sponsor]."

by a clattering noise, they looked and saw the roller on the platform where decedent had been working and decedent falling below that platform within the triangular boundary of the tower, landing on the next lower platform, 69.5 feet below.

It had been decedent's task to paint a section of the leg and the horizontal beams immediately above the platform on which he was standing. Painting in this manner required decedent to use both hands and to look upward, toward the top of the leg he was painting. While decedent might have moved before falling, neither witness noticed that he did so and Armstrong stated that he heard no noises indicating movement and would have expected to notice any movement out of the corner of his eye. Armstrong further stated that it would have taken several minutes for decedent to have done his work on the leg. From these facts, the court infers that decedent was still painting a leg immediately prior to his fall. The court further finds, noting that decedent must have been facing toward a corner of the platform and away from the hole, that he stepped backward into the unguarded hole, dropping his roller as he fell through the hole. The absence of an effective guard around the hole was thus a proximate cause of his death.

Decedent would also have escaped death had he worn a safety belt, attached to a structural part of the tower. The Navy had notified Midwest that a belt and fastening manufactured by a particular company could be used with a safety device built into the ladders on the Cutler towers. Midwest was obligated under the contract to provide such belts if it wished them to be used. None were apparently on hand when decedent was hired. In any event, neither he nor his fellow workers commonly wore such belts. The disadvantage lay in the fact that the belts, as equipped for use on the ladders, had a very short line, making them inconvenient and inefficient to use when a worker was moving about. But a government witness, Crawford, the Director of

Safety on Naval Construction of the Naval Facilities Engineering Command, testified that this disadvantage was avoidable if an eight-foot "tag line" were used to connect a worker, girded by a safety belt, to a rod or beam. Such a length would allow reasonable movement, but would not permit so far a fall as to cause serious injury to a worker. The use of belts so equipped was said to be "good safety practice", although not commonly required. The court finds that a safety belt and tag line properly utilized would have avoided serious injury and that the failure to supply such devices was equally a proximate cause of decedent's fall and death.

### Standard of Care

This brings us to the question whether decedent's accident is attributable to a lack of due care on the part of the United States "to have its premises in a reasonably safe condition and to give warning of latent or concealed perils." Jamieson v. Lewiston-Gorham Raceways, Inc., *supra* at 862. In the ordinary sense, the open hole in the platform was obvious, not "latent or concealed". The Maine Supreme Judicial Court has acknowledged, however, that "in speaking of hidden defects we use a relative term". Franklin v. Maine Amusement Co., 133 Me. 203, 205, 175 A. 305, 306 (1934). The Maine Court has long shown a willingness to take unusual conditions—if reasonably expectable—into account in imposing liability on a landowner for injury caused by hazards even though those hazards would have been obvious to an invitee concentrating intently on safety. In Low v. Grand Trunk Railway Co., 72 Me. 313 (1881), for example, a customs officer, walking a wharf at night while on duty fell into an unguarded gangway which cut across the wharf. The Court, in comparing the risks of falling over the sides or end of the wharf and that of falling into the gangway, observed a greater risk of falling "in such a gangway, midway, where one's eye catches a sense of security from seeing in an uncertain light the bulk of the wharf and of the vessel lying beside it

extending before him." *Id.* at 320. In Franklin v. Maine Amusement Co., *supra,* the Court set aside a directed verdict for defendant in a suit brought by a vaudeville performer who slipped on a wet spot on the stage. While the spot was not a hidden danger in the ordinary sense, the Court recognized that "a condition obvious to one with an opportunity to investigate may be a trap to him who is precluded by the nature of his work from making a careful examination." *Id.* 133 Me. at 205, 175 A. at 306. And in Orr v. First National Stores, Inc., 280 A.2d 785 (Me.1971), although the Court was considering the case of an infant plaintiff, its focus on "the *reasonableness,* or the *unreasonableness,* of the risks of harm engendered by the premises, facilities, instrumentalities, or combinations thereof, in the light of the *totality of the circumstances*", *id.* at 792 (emphasis in original), is relevant here, particularly in view of its citation at 790 of Petersen's Case, 138 Me. 289, 25 A.2d 240 (1942), involving the risk of reasonably anticipated "horseplay" by adults on business premises.

█ The Maine Court, in addition to looking at what reasonable men would call reasonable risks, also assesses "whether, in the exercise of ordinary prudence, there was some change of design or arrangement of facilities or some other effective preventive, or warning, technique which defendant should have undertaken." Orr v. First National Stores, Inc., *supra,* 280 A.2d at 794. In conducting this analysis, that Court has not been overly impressed with what has been customary. In Mayhew v. Sullivan Mining Co., 76 Me. 100 (1884), the Court, in upholding a verdict in favor of a mine worker who had fallen through an unlighted and unguarded ladder hole, affirmed the exclusion of testimony that

railings were not used, deeming custom—even if it "existed since the days of Tubal-Cain"—irrelevant to what constitutes due care. *Id.* at 112. Interestingly, the Court in *Mayhew, Low* and *Franklin* referred to the English case of Indermaur v. Dames, 2 L.R.C.P. 311 (1867), in which the custom in the refining business of not fencing access to a shaft in the floor was of no avail to the landowner. In *Indermaur,* and in *Low,* the feasibility of erecting temporary guard rails without disruption of the landowner's business was a factor in the decision.

For further guidance in charting the course the Maine Court would take if confronted with the present case we turn to the Restatement of Torts, as the Maine Court did in deciding a related issue. Ogden v. Libby, 159 Me. 485, 488, 195 A.2d 414 (1963) (citing § 343). Restatement (Second) of Torts § 343A (1) states:

"A possessor of land is not liable to his invitees for physical harm caused by them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*" [Emphasis added.]

Comment *f.* to that section indicates:

"Such reason to expect harm . . . may arise, for example, where the possessor has reason to expect that the invitee's attention may be distracted, so that he . . . will forget what he has discovered. . . ."

*See also* Illustrations 1–5 to § 343A; Hewitt v. Safeway Stores, 131 U.S.App. D.C. 270, 404 F.2d 1247 (1968) (especially at 1253–4, Robinson, J., concurring); W. Prosser, Handbook of the Law of Torts § 61, at 394–95 (4th ed. 1971).[3]

---

3. Professor Prosser states the principle as follows: "In any case where the occupier, as a reasonable man, should anticipate an unreasonable risk of harm to the invitee notwithstanding his knowledge, warning, or the obvious nature of the condition, something more in the way of precautions may be required. This is true, for example, where there is reason to expect that the invitee's attention will be distracted, as by goods on display, or that after a lapse of time he may forget the existence of the condition, even though he has discovered it or been warn-

*Application of Standard*

The hard question, then, is whether the United States should have anticipated that persons on the platform might fall through the ladder hole, or, more pointedly, whether the United States should have foreseen that workmen on the platform might be distracted by their work. It may well be true that one whose only purpose on the platform was the ascending of the tower in order, perhaps, to inspect or repair the radio equipment at the summit would quite likely remain aware of the ladder holes and conduct himself with primary concern for his own safety. It is nevertheless clear from the testimony of Lieutenant Hildebrand, stationed at Cutler, that the Navy does in fact consistently hire independent contractors to perform maintenance of the towers there. From the frequency of such work, and from the obvious necessity of painting the towers, the court concludes that the Navy must have known that the platform would be used at least by painters. The difference between the ordinary climber and the man whose function on the platform is to paint or otherwise repair is that the latter is occupied with the problems of painting. In the present case, Stanley was required to stand in a corner of the platform near the tower leg, in a four-foot space—only partly occupied by a grating, the remainder being open—separating the leg from the two and one-half by three foot

open ladder hole. His work involved holding a five or six foot long handle, with a paint roller on the end, and reaching up to paint the leg section and beam immediately above him.

Safety expert DeTarnowsky testified that a worker doing sustained work on such a platform tends to undergo "a relaxation of his alertness"; that "[a] person climbing up the ladder and looking at it would see the opening and would take precautions to not fall into it. But we have a change of circumstances when someone is working on the platform doing something. They can't always remember that this opening is there." [4] Taking this testimony as credible under the circumstances found to have been present here, this court holds that the United States should reasonably have foreseen that painters, particularly if inexperienced, might lose both sight and consciousness of the nearby, unguarded ladder hole in the otherwise safe platform and back, trip or otherwise fall into it unless safety precautions were taken.[5]

■ The foregoing conclusion based on the facts and testimony of this case is buttressed by the requirements of the "American Standard Safety Code for Floor and Wall Openings, Railings, and Toe Boards" (A12–1932), promulgated by the American Standards Association. At trial, defendants objected to the introduction of this code into evidence. This

ed . . . . ." [Footnotes omitted.] W. Prosser, Handbook of the Law of Torts § 61, at 394 (4th ed. 1971).

4. While this opinion might ordinarily have bearing on the issue of contributory negligence, such a defense was not affirmatively pleaded, Maine Rules of Civil Procedure, Rule 8(c); and in any event, the burden of proof would have been on the government, R. Field, V. McKusick and L. Wroth, Maine Civil Practice § 8.7 (2d ed. 1970).

5. In *Gowdy v. United States,* 412 F.2d 525 (6th Cir. 1969), the court held that no negligence was involved in the failure of the United States to maintain guard rails around a hole in the roof of a maintenance building and that consequently

there could be no liability under the Federal Tort Claims Act for injuries suffered by a workman who fell through the hole while working on the roof. In reaching this conclusion, the court in *Gowdy* emphasized that the work being performed by the plaintiff could have been accomplished safely and efficiently from the ground. In the present case, decedent had no such alternative. Moreover, the likelihood that a workman would suffer serious injury by falling seventy feet from a platform section approximately four feet square at a height of some seven hundred feet seems to this court far more real and foreseeable than a similar accident occurring from a much greater surface area and at a height of only eleven feet.

court accepted the code *de bene* and now specifically rules that the code is admissible. The mere fact that the code is not binding as law on the United States or anyone else does not mean that it is not relevant to determination of the proper standard of care. Its relevance and widespread acceptance within the safety profession were attested to by expert witness DeTarnowsky. Moreover, the court finds this code indistinguishable in purpose or relevance from the "USA Standard Safety Code for Fixed Ladders" (A14.3–1956), prepared by the same organization and admitted into evidence as a government exhibit by stipulation.[6] The Code for Fixed Ladders specifically declares the Code for Floor Openings to be a "related code". § 1.4. While not relying primarily on the code, therefore, the court thinks it relevant and probative evidence as to the proper standard of care. Boston and Maine Railroad v. Talbert, 360 F.2d 286, 290 (1st Cir. 1966).

The scope provision of the Code for Floor Openings states in part that "[t]his code applies to all places where there is a hazard of persons or materials falling through floor or wall openings and from stairways and runways." § 1.1. Substantively, the code provides that "[e]very ladderway floor opening shall be guarded by a standard railing . . . with the passage through the railing either provided with a swinging gate or so offset that a person cannot walk directly into the opening." § 3.2. In short, the Code recommends as standard practice protection against falling through an opening that, in the court's view, is reasonable and prudent in the particular situation where it is foreseeable that a person concentrating on his work will temporarily lose awareness of the opening.

The government makes a number of related arguments, all of which are variants of the claim that even though the exercise of due care would require railings were this an ordinary structure, the tower's special function precludes their use. There is no doubt in the court's mind, however, that the railings could physically have been installed around the ladder hole without adversely affecting normal use of the radio facility. Lieutenant Hildebrand, Resident Officer in Charge of Construction at Cutler, testified to this effect, and the court credits his testimony. There was no evidence that such railings would have interfered with the usefulness of the ladder to the Navy, as for example by unduly complicating the carrying of large objects. Nor would interference of this sort be likely, for any objects must be carried through the ladder hole itself. This case does not come within the exception for openings required by operating conditions to be left open. *See, e. g.,* Low v. Grand Trunk Railway, *supra,* 72 Me. at 320. Nor, finally, has the government introduced any evidence to show that railings would interfere with the operation of the tower's electronic equipment. It behooved the government, if such were the case, to introduce evidence which it should have possessed showing the likelihood of such interference. In view of the vast amount of steel used in the construction of the tower, any interference from a small number of relatively miniscule railings seems extremely unlikely. In that event, the railings could, as Lieutenant Hildebrand testified, have been constructed of wood or some other non-interfering material.

For similar reasons, the government's contention that the design of the tower is a "discretionary function" within the meaning of 28 U.S.C. § 2680(a), for which the United States cannot be held liable, must be rejected. In the court's view, the point of the

6. The Code for Floor Openings listed a representative of the Bureau of Yards and Docks of the Navy as a member of the code committee. Mr. Crawford testified that he currently represents the Navy with the American National Standards Institute (the successor of the earlier American Standards Association).

exception is that the United States is immune from liability for those aspects of planning and design which relate to whether the government will engage in a particular activity and to what purposes will be served in doing so. Had the evidence warranted the conclusion that railings would have interfered with the electronic performance of the tower or with its usefulness in other respects, the omission of the railing might have fallen within the "discretionary function" exception. But here, apart from a slight cost increase, the decision of the United States as property owner involved no competing policy considerations. The court therefore holds that the failure of the United States to provide guard rails involved a miscalculation solely at the operational level and that consequently the "discretionary function" exception does not apply. See discussion and authorities cited in Reynolds, The Discretionary Function Exception of the Federal Tort Claims Act, 57 Geo.L.J. 81 (1968). The court further holds that by not providing guard rails the United States failed to exercise due care to keep its property in reasonably safe condition, and, as indicated above, that this failure proximately caused the accident.

### Liability of Contractor

The indemnity claim of the United States against Midwest is premised upon a provision in the construction contract making Midwest responsible "for all damages to persons or property that occur as a result of [Midwest's] fault or negligence." Midwest further undertook to "take proper safety and health precautions to protect the work, the workers, the public and the property of others". These contract provisions do not make Midwest liable for the defective design as such. On the other hand, the undertaking to "take proper safety pre-

cautions . . . to protect . . . the workers" would seem to include the responsibility to cure to the extent feasible whatever conditions in the tower were unsafe for its workers. The danger to the workers from the ladder hole was one · such danger which could feasibly have been cured by the installation of a temporary railing or the furnishing of safety belts.

■ Midwest's liability rests on the indemnity clause in its contract with the United States. It is not an unqualified undertaking to assume responsibility for all loss and damage arising out of performance of the contract. The finding, standing alone, that the United States is liable to plaintiff would not transfer liability to Midwest. But the fact that the design delinquency of the United States would have been rendered harmless by fulfillment of the contractual responsibility of Midwest to "take proper safety precautions" does effect the shifting of final liability to Midwest.[7]

### Liability of Subcontractor

■ As to Midwest's claim for indemnity from Petroleum, the court rules that Midwest, by hiring Alexander, Petroleum's president, as its foreman and through him supervising the work, in fact retained control over safety and the painting. On these facts, any negligence of Alexander is chargeable to Midwest rather than Petroleum. Accordingly, the court does not reach the question raised by Petroleum's motion for a directed verdict, whether the brief subcontract impliedly incorporated a contract of indemnity.

### Damages

■ Midwest, then, is liable for such damages as were suffered by plaintiff

---

7. This is not, of course, to say that the United States itself exercised due care by the mere inclusion in the contract with Midwest of the indemnity and safety provisions. These operate only between the parties to the contract and do not affect the United States' underlying liability to plaintiff.

upon the death of her son. The relevant parts of the Wrongful Death statute, 18 M.R.S.A. § 2552 provided, at the time of the death, for "fair and just compensation with reference to the pecuniary injuries resulting from such death of the person [ ] for whose benefit such action is brought" and "in addition thereto, . . . such damages as will compensate the estate of such deceased person for funeral expenses". Funeral and burial expenses have been stipulated to be $952.58 and this amount has been stipulated to be reasonable.

The major element of damages is the amount of support plaintiff would have received from decedent had he lived. It is stipulated that

> "the United States Life Tables 1959–61, as published by the Bureau of the Census may be used to establish life expectancy in this action. Further, that an average white American female who has been and is in good health and of the age of 45 years on August 12, 1967, would have a life expectancy of 32.5 years, and further, that an average white American male who has been and is in good health and of the age of twenty years on August 12, 1967, would have a life expectancy in excess of 32.5 years."

Finding that decedent and plaintiff were average white Americans and in good health, at the time of the accident, and that plaintiff continues in good health, the court concludes that plaintiff is likely to live for 32.5 years after the date of the accident and that she would have been survived by her son had the accident not taken place.

Plaintiff and her brother testified, and the court finds, that prior to his death, decedent provided substantially one hundred per cent of plaintiff's support and that he was loyal to plaintiff and concerned for her care. On the other hand, plaintiff had been regularly employed as a bindery worker by publishing firms until 1966, when she came to Maine to take care of her father. There is no evidence of continuing ill health or other circumstances which would prevent her from working in the future. Since her son's death she has been living with two sisters. Moreover, she has an adult son and daughter who may be presumed to be willing to help support her if necessary. Taking these facts into account, the court concludes that decedent would have provided one half of plaintiff's support for 32.5 years.

Decedent had completed high school. Although he had taken two courses in a college summer school, he had received "D's" in those courses and had not secured admission as a full-time student. The court finds that plaintiff failed to establish any likelihood that decedent would ultimately make substantial progress toward a college degree. The parties have stipulated that the median income of a male who has completed four years of high school and was employed full-time in 1970 was $9,567. United States Bureau of the Census, Current Population Series P–60 No. 80. Accordingly, the court finds that his average annual income over the 32.5 years would have been $9,567.

Plaintiff testified that decedent enjoyed a normal social life, and the court so finds. The parties have stipulated that the average population per household as of March 1970 in the United States was 3.17 persons. Statistical Abstract of the United States 36 (1971 ed.). The court finds that this would have been the size of decedent's household. On the basis of the foregoing, the court finds that plaintiff would have received on the average one half of $\frac{1}{3.17}$ part of $9,567, or $1,509, in support per year, for 32.5 years.

The court recognizes that the attempt to estimate damages of this nature is at best a guess, the reasonableness of which rests on the underlying assumptions. The only merit of the above assumptions is that they are based on current census data, and that there do not appear to be any better assumptions. The court is without reliable data to predict the future. It recognizes that inflation has

been and is likely to remain a condition of life. While decedent may well have earned more than an average of $9,567 over the next 32.5 years had he lived, because of inflation, to some extent at least plaintiff has the opportunity, by investment, to ride with the economy and realize income augmented by any inflation.

The court chooses a discount rate of six per cent. That is, it assumes that any lump sum received can realize a return at that rate. In fact, plaintiff, if a skilled investor, might presently be able to do much better. Even as an unskilled investor, substantial continuing inflation would allow her to reap a higher return.

The present value of a stream of income in the amount of $1,509 over 32.5 years, discounted at the rate of six per cent, with interest compounded quarterly, is $21,519. This amount, added to total funeral and burial expenses, $952.-58, entitles the plaintiff to recover from Midwest the sum of $22,471.58.

In accordance with the foregoing, it is adjudged and ordered as follows:

1. The United States failed to exercise the due care required under the circumstances and proximately caused the accident involving decedent by not providing guard rails on the radio towers at the Naval Radio Station in Cutler, Maine;

2. Midwest failed in its contractual undertaking to the United States by not correcting this condition, as it feasibly could have done by installing temporary railings or supplying safety belts, so that it is guilty of concurrent negligence and is obligated to reimburse the United States for all damages found due to plaintiff;

3. Petroleum is absolved of any responsibility to reimburse Midwest since actual control of the project was retained at all times by the latter;

4. Judgment will be entered in favor of the plaintiff in the amount of $22,-471.58.

Dated at Portland, Maine, this 28th day of July, 1972.