Terry Lee STONEHOCKER, Appellee,

v.

GENERAL MOTORS CORPORATION, Appellant.

No. 76–1920.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 8, 1978.

Decided Nov. 17, 1978.

E. Milton Farley, III, Richmond, Va. (Joseph C. Kearfott, Christopher J. Habenight, Hunton & Williams, Richmond, Va., Frazer F. Hilder, Gen. Motors Corp., Detroit, Mich., Edward W. Laney, III, Turner, Padget, Graham & Laney, Columbia, S.C., on brief), for appellant.

David W. Goldman, Sumter, S.C. (Arthur S. Bahnmuller, Howard P. King, Bryan, Bahnmuller, King, Goldman & McElveen, Sumter, S.C., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and RUSSELL and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

The plaintiff, Terry Lee Stonehocker, brought this action, charging negligence, against General Motors Corporation for injuries received when his car, a 1968 Chevrolet Camaro (manufactured by General Motors), rolled over in an accident. Jurisdiction was based on diversity of citizenship and the requisite amount in controversy. 28 U.S.C. § 1332(a)(1). The parties agree that General Motors' negligence, if any, did not cause the accident itself, but the plaintiff alleges that General Motors' negligent design of the car's roof and negligent manufacture of the windshield [1] combined to cause injuries which would not otherwise have occurred in an accident of this type or would have been substantially less. At trial, the jury found for the plaintiff and awarded compensatory and punitive damages.

On appeal, the defendant argues that the plaintiff presented no evidence of (1) negligent roof design, (2) negligent windshield manufacture, (3) causation between the alleged defects and plaintiff's injury, and (4) willful, wanton, or conscious conduct; and that therefore the district court should have entered a directed verdict in General Motors' favor on all issues. Further, the defendant argues that the district court charged the jury improperly, and that it erred by refusing to admit evidence that General Motors' roof design complied with Federal Motor Vehicle Safety Standard 216. Based on these last two points, the defendant requests a new trial.

For reasons discussed below, we only reach the issues of the admissibility of the federal safety standard and the sufficiency of the jury instructions. We hold that the district court erred in refusing to admit General Motors' compliance with the subsequently enacted safety standard as evidence of due care. Therefore, the case must be reversed and remanded for a new trial. We also discuss the objections to the jury instructions.

I

The accident occurred in Sumter County, South Carolina on July 25, 1972 at approximately 6:00 p. m. The plaintiff, Stonehocker, was driving west on Route 76–378, a four-lane, limited access highway. The plaintiff testified that he was traveling approximately sixty-five miles per hour in the left or passing lane, with his seat belt fastened and the driver's window rolled down. Another car entered the highway from his right via an access road. That car moved from the access road (acceleration lane) across the right lane and into the left lane directly in front of the plaintiff's car. To avoid a collision, Stonehocker swerved to the right across the right hand lane and off the pavement. Plaintiff did not clearly remember what happened next, but an eyewitness testified that the plaintiff's car went into a spin, slid off the road, went partially into a ditch, continued to slide, and finally rolled over on its top at a speed of approximately five to ten miles per hour. The roof of the car was crushed in (although there is a dispute as to how far), causing the windshield to break into a number of large jagged pieces. As a result of the accident, the plaintiff suffered severe injury to his left arm, although conflicting testimony was presented as to its exact cause.

The facts of this case fall into the category of what has come to be known as crashworthiness or second collision products liability cases. The initial issue in cases of this type is whether an automobile manufacturer owes its customers any duty to

---

1. The windshield was manufactured by Libby Owens Ford (LOF), but on plaintiff's theory of the case General Motors is liable for any negligence of LOF because it is claimed General Motors failed to further test any of the windshields it bought for 1968 Camaros.

design or manufacture a crashworthy vehicle. There is a conflict of authority on the existence of such duties. Compare, e.g., *Evans v. General Motors Corp.*, 359 F.2d 822 (7th Cir. 1966), cert. den., 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966) (no duty); *McClung v. Ford Motor Co.*, 333 F.Supp. 17 (S.D.W.Va.1971), affirmed 472 F.2d 240 (4th Cir. 1973), cert. den., 412 U.S. 940, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973) (no duty); with *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968) (duty exists); *Volkswagen of America, Inc. v. Young*, 272 Md. 201, 321 A.2d 737 (1974) (duty exists); *Issacson v. Toyota Motor Sales*, 438 F.Supp. 1 (E.D.N.C.1976) (duty exists); *Dreisenstok v. Volkswagenwerk, A.G.*, 489 F.2d 1066 (4th Cir. 1974) (duty assumed to exist). However, South Carolina law governs on this point, and the Supreme Court of that State has imposed a duty on automobile manufacturers to use due care in car design in *Mickle v. Blackmon*, 252 S.C. 202, 166 S.E.2d 173 (1969), and spoke favorably of a duty to so manufacture the cars with respect to crashworthiness. *Mickle*, 166 S.E.2d at 186. This duty is not absolute. No liability will attach unless the negligent design was unreasonably dangerous. *Mickle*, 166 S.E.2d at 192. Reasonableness in this context ". . . should be determined by general negligence principles, which involve a balancing of the likelihood of harm, and the gravity of harm if it happens against the burden of the precautions which would be effective to avoid the harm." *Dreisenstok v. Volkswagenwerk, A.G.*, 489 F.2d 1066, 1071 (4th Cir. 1974), quoting *Larsen v. General Motors Corp.*, 391 F.2d 496, 498 (7th Cir. 1966); *Mickle*, 166 S.E.2d at 192. In applying this test, a wide variety of factors come into play. The intended use of the vehicle, styling, cost to change design, the obviousness of the defect, and the circumstances of the accident itself are all relevant. *Dreisenstok*, 489 F.2d at 1071–73.

Turning to the case at hand and the admissibility of the federal safety standard, it is clear that the issue of negligent roof design is central to this case. The plaintiff argues that if the roof had not been crushed in as it was, and the windshield had not been manufactured as it was, the windshield would not have broken as it did, and plaintiff's arm would not have been cut, at least as badly as it was. In order to prevail, the plaintiff must show that the design of the roof was unreasonably dangerous. As part of his proof on this question, the plaintiff called an expert witness, Dr. Hanagud, who testified to design flaws in the roof. The plaintiff also introduced evidence showing that General Motors had not done any rollover testing on the 1968 Camaro.

General Motors countered with its own experts who testified to the strength of the roof design, attacked plaintiff's testing techniques, and explained that rollover testing for each individual body style was not necessary. General Motors also offered evidence that the Camaro roof structure met and exceeded the requirements of Federal Motor Vehicle Safety Standard 216. 49 C.F.R. § 571.216. The district court excluded the evidence of compliance with the safety standard because the standard "was not in force at the time of the automobile's construction or at the time of the accident." Of course, if the evidence was otherwise inadmissible the district court's ruling should be affirmed. *SEC v. Chenery*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

■ In determining the admissibility of Standard 216, we must first determine if there is any conflict between federal and State law. This is a diversity case under *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and federal courts are to apply the substantive law the State in which they are sitting would apply if the case had originated in a State court. Procedural rules, however, are generally not subject to *Erie* and federal law governs. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). This procedural as opposed to substantive distinction is not always easy to apply, and evidence law has caused particularly difficult problems.

While it is acknowledged that *Erie* and *Hanna* may govern the admissibility of evidence, there does not seem to be general agreement as to the effect *Hanna* had on

the *Erie* decision with respect to leaving matters of substantive law to the rule in State courts. See Wright, *Law of Federal Courts*, (2d Ed. 1970) § 93; Wright, etc. (3d Ed. 1976) § 93; Advisory Committee's Note to the proposed Federal Rules of Evidence, 46 F.R.D. 243; *Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551 (2d Cir. 1967); the editorial comment and parts of the various committee reports on Rule 501 contained in Redden & Saltzburg, *Federal Rules of Evidence Manual.* The gist of the discussions is that some authorities take the view that under *Hanna* Congress especially may validly enact any rule of evidence, not subject to *Erie* limitations, while others take the view that *Erie* limits rules of evidence to those matters not being in fact substantive law. A principal controversy over the new rules concerned privilege and burden of proof. In general terms, Congress left those matters, so far as presumption and privilege are concerned, to the rule in the State courts in diversity cases. Rules 302 and 501.

 But we need not decide here any limitations of *Erie* on the Federal Rules of Evidence. Rule 402 provides that all relevant evidence is admissible except as provided by the Constitution, Act of Congress, the rules themselves, or other rules prescribed by the Supreme Court pursuant to statutory authority. It follows that under the new rules all relevant evidence is admissible subject to exceptions. The evidence with which we are dealing in this case is relevant. There is no doubt about that. Standard 216 is a federal regulation with force of law promulgated under the Traffic Vehicle and Motor Safety Code of 1966, 15 U.S.C. § 1381 et seq. Section 1392(a) directs the Secretary of Transportation to issue "appropriate Federal motor vehicle safety standards." Section 1391(1) defines motor vehicle safety as including "the performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected . . . against unreasonable risk of death or injury to persons in the event accidents do occur, and includes non-operational safety of such vehicles." Standard 216 in terms "establishes strength re-

quirements for the passenger compartment roof," and gives as its "purpose" "to reduce deaths and injuries due to the crushing of the roof onto the passenger compartment in rollover accidents." 49 C.F.R. § 571.216, pars. S–1, S–2. So the statute and the regulation literally address the same subject as a part of the theory upon which this case was brought, that the roof structure of the Camero was negligently designed.

 The evidence being relevant, it should therefore be admissible unless some rule of law makes it inadmissible. The plaintiff relies on *Shearer v. DeShon*, 240 S.C. 472, 126 S.E.2d 514 (1962), as holding like evidence to be inadmissible. We do not agree that such is the holding of *Shearer*, which case merely held that at least a causative violation of an applicable statute constitutes actionable negligence. The statutes involved there were motor vehicle statutes concerning speed and keeping control of an automobile. If the *Shearer* case has any bearing on our case one way or the other, it would not seem to be persuasive toward denying the admissibility of the evidence presented here.

More importantly, there has not been presented to us, and we find no, South Carolina authority providing that a violation of a regulation, with or without the force of law, should or should not be admitted into evidence. There seems to be a dearth of authority on the question in South Carolina. That being so, we conclude there is no stated policy of South Carolina either favoring the admissibility of such evidence or disfavoring it. This discussion is relevant to the question before us because of cases such as *Conway v. Chemical-Leaman Tank Lines, Inc.*, 540 F.2d 837 (5th Cir. 1976). That case, decided under the new Federal Rules of Evidence, held that there are State evidentiary rules so bound up with the substantive law of the State that a federal court sitting in that State should accord it the same treatment as the State courts in order to give effect to the State's substantive policy. In *Conway* the court held admissible, in a wrongful death

action by a widow for her husband's death, the fact of her subsequent remarriage, apparently in mitigation of damages. The evidence admitted had nothing to do with burden of proof or presumption or privilege, and the Texas rule involved concerned the admissibility of evidence. Whether *Conway* might be considered to have been decided under *Erie*, the controversial evidence being a matter of substantive law, or in accordance with the reading of the tenor of the congressional history of the new Rules of Evidence that matters of basic State policy will be decided according to the State rule of decision, makes little difference, for the decision does stand for the proposition that there are some matters of State policy so basic that they should be accorded the same treatment they have in the State courts even under the new rules. The precise holding of the Fifth Circuit was that it would not say the exclusion of evidence under the Texas statute was harmless error since the Texas courts had said it could not be.

But, in the absence of any indication of any policy in South Carolina, we should be guided by the literal terms of the new rules and admit relevant evidence unless there is some reason not to do it. We do not imply that South Carolina can make no different rule; that is simply a question not before us for she has not done so.

Not only would a compliance with Standard 216 be relevant to the inquiry at hand according to the terms of the statute and the regulation itself, the congressional history of the statute found in United States Code, Congressional and Administrative News (1966), p. 2709, et seq., makes it clear that an object of the statute was to improve the safety of vehicles, and speaks in terms of collision protection, second collision, crashworthiness, etc., which seem to have become words of art as they relate to cases such as the one we have before us. The primary responsibility, says the report of the Senate Committee on Commerce, for regulating the national automotive manufacturing industry must fall squarely upon the federal government. P. 2712.

The statute was enacted in 1966. Standard 216 was last amended in 1973 and was first promulgated in 1971. The automobile involved in the accident was manufactured in 1967 and the accident occurred in 1972. The case was filed in 1974 and terminated in 1976.

It is seen that Standard 216 was not in effect at the time the automobile was manufactured, having been first promulgated some years later. Whether the regulation was in effect at the time of the accident we do not think has any relevance because, the case being based on negligence, the relevant time period involved would be at or prior to the manufacture of the vehicle in 1967. The regulation in terms applies only to motor vehicles the manufacture of which is completed on or after the effective date of the standard. 49 C.F.R. § 571.7.

But we are not here dealing with a claimed violation of the regulation as being either negligence itself or evidence of negligence; we are dealing with the question of whether or not to admit a claimed compliance with the regulation as evidence of due care.

There are many reasons why, if the vehicle manufactured in 1967 did not comply with a regulation later promulgated, as here finally in 1973, that the fact of noncompliance might be inadmissible. In the first place, the time frame of the standard of care must be 1967, not 1973. Further, perfectly valid policy reasons may dictate that such regulations not be made retroactive, and it is well known that retroactive application of statutes in general is not favored. No reason seems apparent to distinguish regulations.

But here General Motors takes the position that in 1967 it, ahead of its time, manufactured a vehicle which complied with safety requirements promulgated from 1971 through 1973. Conceding, as we must, that the statute, 15 U.S.C. § 1397(c), would prevent evidence of compliance with the standard from exempting General Motors from negligence for a vehicle subject to the terms of the regulation, nevertheless we believe that a compliance with the standard

should have been admitted into evidence as evidence of due care in the design of the vehicle to be considered by the jury with the other evidence in the case.

■ It is general law that custom is admissible against which a finder of fact may measure a standard of care. Wigmore on *Evidence*, 3d Ed., § 461; Prosser on *Torts*, 4th Ed., § 33. Safety codes promulgated by an industry or trade or like regulations have similarly been admitted. E. g. *Spurr v. LaSalle Construction Co.*, 385 F.2d 322 (7th Cir. 1967) (trade manual); *Boston and Maine Railroad v. Talbert*, 360 F.2d 286 (1st Cir. 1966) (nationally recognized standard for railway crossing); *Fluor Corporation v. Black*, 338 F.2d 830 (9th Cir. 1964) (Corps of Engineers safety program and manual and safety regulations of Arizona Industrial Commission); *Merchants National Bank of Arizona v. Elgin J. & E. Ry. Co.*, 49 Ill.2d 118, 273 N.E.2d 809 (1971) (regulations of Department of Public Works and Buildings on grade crossings); *Quinn v. United States*, 312 F.Supp. 999 (D.Ark.1973) (regulations of the Corps of Engineers referring to traffic control standards); *Stanley v. United States*, 347 F.Supp. 1088 (D.Me.1972) (American Standard Safety Code for Floor and Wall Openings).[2]

■ We think that Standard 216, the relevancy of which must be admitted, has at least as much probative value as custom, a trade manual, or the various regulations and standards mentioned above. Therefore, we are of opinion that if General Motors can prove a compliance with Standard 216, that fact should be admitted into evidence and the jury permitted to consider it. The plaintiff claims that General Motors did not comply with Standard 216 in all events. We express no opinion on that question. Whether or not General Motors complied with the standard will have to be ascertained on remand by a trier of fact.

The plaintiff argues that if the rule would permit General Motors to prove compliance with Standard 216, then the rule should also permit the plaintiff to prove non-compliance with Standard 216, so that, the argument goes, if compliance is evidence of due care, then non-compliance should be evidence of negligence. Quite possibly this might be true in some cases, but it is not necessarily true here, for there is a great deal of difference in failing to comply with a standard several years before it is enacted as tending to show negligence, and designing a car far enough in advance so that it does comply as tending to show due care. The difference is obvious. In all events that question is not now before us and it will have to await another day.

## II

■ The defendant objects that the trial court instructed the jury before the evidence, before final argument, and after final argument, and that the jury was not fully instructed "after the arguments are completed," which it says is required by FRCP 51. The plaintiff says the defendant was advised that the last two mentioned instruction sessions would be split and did not object until after final instructions were completed. While introductory instructions may serve a useful purpose and are often proper and helpful in acquainting the jury with the nature of the case, we think that when such instructions are used, it is better to instruct fully after arguments are completed in accordance with FRCP 51, even if the earlier instructions are repeated. We do not decide if the manner of instructing the jury was reversible error because we believe the trial court will correct this on remand. We realize, of course, that FRCP 51 does not contain the word "fully."

■ The jury was charged, as a part of the instruction pertaining to damages, that "recklessness is consciously doing a negligent act, really, or doing a negligent act when an ordinary person would know it was negligent even though they didn't know it consciously, or should know. So that's a higher degree of failure to use due care." The court later charged the jury that they

---

**2.** Wigmore, supra, § 462 takes the position that violation of an ordinance should not be evi- dence of negligence unless its violation is negli- gence *per se*.

were to return a verdict for punitive damages if the defendant were guilty of reckless and willful conduct. The parties agree that *Rogers v. Florence Printing Co.*, 233 S.C. 567, 106 S.E.2d 258 (1968), sets out the rule for punitive damages. That case, while reciting that the standard had been variously referred to in South Carolina, held that " 'exemplary damages should not be awarded for mere gross negligence'," and further held that the common denominator was "at the time of his act or omission to act the tort-feasor [must] be conscious, or chargeable with consciousness, of his wrongdoing." The narrow holding of the case was that there was no distinction between holding a tortfeasor for " 'gross disregard of the rights of the person injured' " and " 'conscious indifference to the rights of the plaintiff'." 106 S.E.2d at 264.

The instruction complained of does not meet these criteria; neither does it meet a standard of a "conscious failure to observe due care" or "present consciousness of wrongdoing," earlier mentioned in the *Rogers* opinion.

The plaintiff argues that since the district court coupled its direction to award punitive damages for reckless conduct with a duty to award such for willful conduct, the defendant is reading the objectionable portions out of context. While this arguably may be so, the part objected to obviously does not comply with *Rogers*. While we do not decide whether the charge, read as a whole, constitutes reversible error, on remand any instruction on punitive damages should be within *Rogers'* limits.

 General Motors takes the position that the district court should have charged the jury that it was responsible only for any injuries suffered because of its negligence which enhanced the injuries Stonehocker would have received in any event. The plaintiff says the case was not tried on this theory, but on the theory that his injuries were all caused by the windshield breaking as it did, in turn caused by the faulty roof. He says that there was no evidence to support an instruction on enhanced injury, although the district court

had so described the case in its preliminary charge. Again, we do not have to pass upon that claim. On retrial the defendant is entitled to such an instruction if supported by the evidence. *Huddell v. Levin*, 537 F.2d 726 (3rd Cir. 1976); see *Dreisenstok*, p. 1076. We also think the burden is on the plaintiff either to establish that he would have suffered no injury or the extent of the injury he would have suffered, had the vehicle been properly designed. *Huddell*, pp. 737–739.

### III

 As has been noted, we are also asked to direct the entry of judgment for the defendant because of insufficient evidence both as to the cause of action and as to punitive damages.

A principal complaint is that the plaintiff's expert witnesses, while they may have been otherwise qualified in other fields, got out of their fields in their testimony and did not sufficiently explain their conclusions.

Damning evidence, for example, was that General Motors should have designed the vehicle so that the roof would depress only 3 inches in a 55 mile per hour rollover. Unexplained in the testimony is how far the expert would expect the vehicle to travel while stopping in such a hypothetical rollover, at what speed the vehicle would be traveling when it so rolled over, and, most importantly, the manner in which the windshield would have broken had the roof depressed only as much as a properly designed roof should have. We suppose the inference the testimony seeks to draw is that the roof only should have depressed 3 inches instead of the various other distances testified to, otherwise its relevance is suspect. If that is true, absent from the record is any evidence as to the manner in which the windshield would have broken had the roof depressed only 3 inches, or any lesser distance than it did. Also, plaintiff's experts testified the roof should have been designed for a 55 mile an hour rollover without explaining the details of exactly what a 55 mile per hour rollover consists of or what they had in mind. Unexplained is the ef-

fect plaintiff's 65 mile per hour speed just prior to the accident might have on a 55 mile per hour rollover.

Another example is that the record is not clear as to those parts of the windshield in question which were measured for thickness by plaintiff's experts. If, in fact, plaintiff's experts only measured those parts which had been exposed to the sun and weather for considerable periods of time, then the evidence seems fairly well uncontradicted that the plastic center part of the windshield when so exposed would deteriorate. Plaintiff's experts seemed to be testifying that the plastic center layer of the windshield did not adhere to the glass or did not properly adhere because it was too thin. If it did not adhere at all, then the evidence shows that there would have been opaque spots in the windshield where the plastic center did not adhere. The very absence of any evidence of such opaque spots, if we construe plaintiff's claim correctly, might lead some to believe that the evidence of plaintiff's experts will respect to the windshield was in a field in which they had little knowledge, as they very nearly admitted.

Equally thin is the testimony as to punitive damages, but when the admissibility of evidence is controlled by *Rogers*, which we have previously cited, that matter will possibly be corrected on remand.

Despite this, as well as other deficiencies, a jury has heard the case and found for the plaintiff. Taking all the inferences from the testimony at face value, we are not presently so convinced that the verdict was without evidence to support it as to consider the merits of the argument and simply direct the entry of judgment for the defendant. Accordingly, since a district court on a motion for judgment notwithstanding the verdict in accordance with FRCP 50(b) may order a new trial in the interest of justice and fair play, and because other error requires a new trial in any event, we think a proper course here is to award a new trial without passing upon the sufficiency of the evidence, which we do not do. See *Cone v. West Virginia Paper Co.*, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947);

Wright and Miller, *Federal Practice and Procedure*, §§ 2537–2538; Wright, *Law of Federal Courts* (2d Ed. 1976) § 95; Moore's *Federal Practice* 2d Ed., para. 59.08[5].

VACATED AND REMANDED FOR A NEW TRIAL.